[No. 30780. Department One. June 10, 1949.]

WILLIAM J. MEAD *et al., Appellants,* v. T. D. ANTON *et al., Respondents.*[1]

[1]Reported in 207 P. (2d) 227.

*Copeland & Tollefson,* for appellants.

*Peterson & Duncan* and *Lester Seinfeld,* for respondents.

BEALS, J.—For some time prior to March, 1946, T. D. Anton and J. T. Mitchell, as copartners, were operating a restaurant, known as "Anton's Coffee Shop," located in the Perkins building, which is on the southeast corner of south 11th and A streets in Tacoma. The restaurant occupied the northwest corner of the ground floor of the building. The partners, having decided to dispose of the business, informed Mr. Krefting, a real-estate broker, that they would sell for seventeen thousand dollars.

The plaintiffs in this action, William J. Mead and Robert C. Trent, who had been discharged from the United States navy and were looking for a business opportunity, were contacted by Mr. Krefting, and, after a thorough examination of the premises and accounts, agreed to purchase the restaurant business at the price fixed by the owners.

Apparently, an earnest-money agreement was entered into, and, later, a bill of sale of the business and an assignment of the existing lease, in which T. D. Anton was named as lessee, were prepared. Messrs. Anton and Mitchell signed and acknowledged the bill of sale, making the usual affidavit that the property was free and clear of all debts, and Mr. and Mrs. Anton, with the consent of the lessors, signed and acknowledged the assignment of the lease.

Prior to the execution of these instruments, they were in the possession of Messrs. Anton and Mitchell, who had ample opportunity to examine them, and did so.

The agreed purchase price was paid, and the premises were turned over to Messrs. Mead and Trent.

The bill of sale contains the following:

"It is understood and agreed that the sellers shall not enter into competition with the buyers for a period of ten (10) years within a radius of five hundred (500) yards of the present location of the Perkins Building, Tacoma, and in the event the sellers shall breach this covenant they shall pay $500.00 per month for each month that the breach continues; . . . "

The last paragraph of the assignment of the lease reads as follows:

"It is understood and agreed that the Assignors are presently engaged in the restaurant business in the Perkins Building and that they have sold the same to these Assignees, and they hereby agree that they shall not enter into a competitive business with said Assignees within a radius of Five Hundred Yards from the existing restaurant which they now operate, and that in the event they shall breach this covenant, they hereby agree to pay unto the said Assignees as liquidated damages the sum of Five Hundred Dollars ($500.00) for each month or part of each month that such breach shall continue."

During the month of November, 1946, Messrs. Anton and Mitchell purchased what is referred to as the "Broadway Sport Center," located at 739 Broadway, Tacoma, and commenced to operate therein a restaurant and tobacco business of a character similar to that which they had carried on in the Perkins building.

William J. Mead and Robert C. Trent, during the month of March, 1948, instituted this action against T. D. Anton and Mary Anton, his wife, and J. T. Mitchell and Sadie A. Mitchell, his wife, alleging the sale by the defendants to plaintiffs of the restaurant business located in the Perkins building, and that the defendants had violated their agreement with plaintiffs by operating and conducting a competing business located within a radius of five hundred yards from the Perkins building.

The plaintiffs demanded judgment against the defendants for the sum of $6,750, representing the agreed liquidated damages, according to the contracts between the parties, up to the date of the complaint, demanding a further recovery

at the rate of five hundred dollars per month for any additional period of time that the defendants should continue to violate the agreement, and praying that the defendants be enjoined and restrained from the further operation of their business, or any like business, within a radius of five hundred yards from the location of plaintiffs' business.

The defendants Mitchell answered the complaint, admitting the sale to the plaintiffs of the restaurant in the Perkins building, which defendants had formerly owned, and that they had, as part of the transaction, made the agreement as set forth in the bill of sale of the restaurant, above quoted. The defendants further admitted that they had engaged in business at 739 Broadway, but denied that their place of business was located within a radius of five hundred yards from the Perkins building. Defendants Mitchell further alleged that, January 1, 1948, they had sold their interest in the Broadway Sport Center and, after that date, had no interest whatever in the business.

Defendants Anton filed their answer, making the same admissions in their answer that the defendants Mitchell had made in theirs, stating that, since November 15, 1946, they had been interested in the operation of the Broadway Sport Center, but denying that that business was within a radius of five hundred yards from the Perkins building. They denied the other allegations of the complaint, and asked for dismissal of the action.

The case was tried to the court, sitting without a jury, and resulted in the entry of findings of fact and conclusions of law in favor of the defendants, followed by a judgment dismissing the action with prejudice, from which judgment the plaintiffs have appealed.

Appellants make the following assignments of error:

"We respectfully submit that the trial court erred in the following particulars:

"(1) In permitting respondents to testify as to what they 'thought' was meant by the language 'within a radius of five hundred yards.'

"(2) In considering the testimony after its offer of what the respondents 'thought' was meant by the language 'within a radius of five hundred yards.'

"(3) In requiring appellants to prove specific damages where the Complaint was based upon stated liquidated damages.

"(4) In finding that the language 'within a radius of 500 yards' permitted measurement by other than a straight line.

"(5) In finding that respondents' competing restaurant was not within a radius of 500 yards of appellants' business.

"(6) In finding that the stated liquidated damages of $500.00 per month was a penalty.

"(7) In finding that the stipulated sum of $500.00 per month as liquidated damages was out of all proportion to the damages sustained or the damages that reasonably might be anticipated.

"(8) In finding that the point from which the 500-yard radius should commence was the geometric center of appellants' restaurant.

"(9) In finding that although the major portion of the respondents' competing business was within the 500-yard radius, that this did not constitute a breach of the restrictive covenant.

"(10) In finding that the arc prescribed by the 500-yard radius cut through one of the entrances to respondents' place of business, and hence placed respondents beyond the restricted area.

"(11) In overruling appellants' Motion for a Judgment Notwithstanding the Oral Decision of the Court.

"(12) In entering a Judgment and Findings in favor of the respondents instead of in favor of the appellants.

"(13) In speculating whether or not the restriction and provision for liquidated damages was contained in the earnest money receipt.

"(14) In finding that the earnest money receipt was controlling in the face of the bill of sale and assignment of lease subsequently executed by the respondents."

Appellants argue assignments Nos. 1, 2, 13, and 14 together.

█ The admission of testimony in violation of the parol evidence rule, does not make the testimony admitted competent, whether it is admitted without, or over, objection. In the recent case of *Dennison v Harden,* 29 Wn. (2d) 243, 186 P. (2d) 908, we said:

"The parol evidence rule is not a rule of evidence; it is a rule of substantive law, and testimony falling within the

inhibitions of the rule does not become admissible merely because it is not objected to: [Citing cases.]"

No earnest-money receipt entered into by the parties was offered or received in evidence, and the testimony concerning the same was rather vague. In any event, the bill of sale and the assignment of the lease, both of which were received in evidence and the pertinent portions of which are above quoted, are not conflicting, the assignment merely being somewhat more specific, and constitute the final and complete contract between the parties.

Respondents never did and do not now contend that they did not fully understand the provisions of these instruments. The language, pertinent to this inquiry, is plain and unambiguous. Respondents admit that they fully understood that they agreed not to enter into the restaurant business within a specified distance from the restaurant which they had sold to appellants.

Appellant Mead testified that, a few months after their purchase of the restaurant, a real-estate agent called upon appellants and asked if they would accept two thousand dollars to permit respondents to operate a restaurant, known as the "Polar Bear," which was within the restricted territory. The witness testified that the offer was refused, and that they heard nothing more concerning any contemplated purchase by respondents.

Appellants' assignments of error Nos. 4, 5, 8, 9, and 10 are concerned with rulings of the trial court in connection with the construction of the contract between the parties, whereby respondents agreed that they would not, for the period of ten years, enter into competition with appellants within a radius of five hundred yards of the present location of the Perkins building; and that, in the event of breach of this agreement by respondents, "they shall pay $500.00 per month for each month that the breach continues."

The evidence shows, and the trial court found, that, on or about November 15, 1946, respondents Anton and Mitchell, and one John G. Tryfon, as copartners, purchased for thirty thousand dollars (each partner contributing one third of the

amount) the business known as the "Broadway Sport Center," located at 739 Broadway, Tacoma. This business included a restaurant, and no contention is made that it was not a business of the class which competed with appellants' restaurant. The trial court also properly found that respondents in this action were fully aware of the restrictive covenants referred to hereinabove.

Respondents testified that, knowing of these covenants, they measured the distance between the restaurant which they had sold to appellants and the restaurant which they proposed to purchase, construing the contract between the parties as preventing respondents from entering into a competing business within five hundred yards from the Perkins building, measured along existing streets and sidewalks, and that, by this method, the Broadway Sport Center was approximately two thousand feet from the nearest portion of the Perkins building.

The three-story building in which the Broadway Sport Center is located covers all of lot 15, block 705, of the plat of Tacoma, the building facing on Broadway (which is higher than Commerce street), and running through to Commerce street. The ground floor of the building fronts on Commerce street and is occupied by a storage garage. In the rear of the garage is a stairway, leading to the Sport Center on the second floor, which fronts on Broadway. The third floor is occupied by bowling alleys.

On Broadway, there are three entrances. One door, close to the northwesterly corner of the building, leads upstairs to the bowling alleys, but this door also affords an entrance to the Sport Center. A short distance to the south is the main door, leading into the Sport Center, and further south is a doorway by which one enters a barber shop, which, however, directly connects with the Sport Center. This barber shop was established by respondents after their purchase of the Sport Center.

Respondents and Mr. Tryfon operated the Sport Center until January 1, 1948, when respondents Mitchell sold their interest in the business to respondents Anton. Apparently,

respondents Anton also purchased Mr. Tryfon's interest, and the court found that, since January 1, 1948, respondents Anton have been sole owners and operators of the Sport Center.

The court found that both Anton's Coffee Shop and the Sport Center are located in the business portion of the city of Tacoma; that the area between the two businesses is covered with buildings; that the only means of travel between the two restaurants is by using the existing streets and sidewalks, and that it is "impossible for human beings to travel between said businesses by a direct line."

The trial court found that, measured by a direct line, the distance between the northwest corner of the Perkins building and the northwest corner of the Sport Center is 1,470 feet; that the distance from the center of Anton's Coffee Shop to the northwest corner of the Sport Center is 1,509 feet, and that the distance between the two establishments, by existing streets, is 2,010 feet.

The evidence shows, beyond all question, that, at the time of the transaction between the parties, respondents had determined not to re-enter the restaurant business, and that they so informed appellants. This respondents do not deny, although they testified that, prior to the preparation of the bill of sale and assignment of the lease, the matter of the inclusion therein of such restrictive covenants as those here in question was not discussed between the parties. Respondents admitted, however, that both the bill of sale and the assignment of the lease were turned over to them for examination; that they had them in their possession for some time, and that, prior to executing both documents, the respondents were fully advised concerning these covenants and understood exactly what they meant. Each respondent testified that he fully understood that the covenants bound them not to enter into any competing business within the area described in the instruments.

On cross-examination, respondent Mitchell testified as follows:

"Q. Now, you say that you understood that this 500 yards was a walking distance?  A. Yes, that is the way I took it.

Q. But you did not discuss that with anyone, that is just what you thought yourself? A. Yes. Q. Yes. A. There was some little discussion there, but it wasn't paid much attention to, and as I said, we just simply wasn't intending to go into it again at the time."

Respondent Anton testified that he read the covenants, but construed the restricted area as consisting of five blocks, which he estimated as fifteen hundred feet. Referring to the covenant, he testified: "It was there to stop me from going into business within the five blocks all right."

Respondents, having discovered that they were unable to carry out the plan which they had in mind when they sold the restaurant, after several months, contemplated purchasing another restaurant, but, as this was only two blocks from the Perkins building, they realized that the restaurant was within the restricted area and abandoned the project.

On cross-examination, Mr. Anton testified:

"Q. No one discussed blocks with you when this agreement was signed, did they? A. Nobody discussed anything, blocks, or otherwise. Q. Just what was in the bill of sale? A. That is right."

The witness then reiterated his statement that, when the transaction was entered into, respondents did not intend to re-enter the restaurant business, stating that he so advised the appellants.

It is evident that a considerable portion of the purchase price paid by appellants for the business, probably more than half, was for the good will which the restaurant had established.

The language contained in the restrictive covenants, while somewhat technical, is not ambiguous. By both the bill of sale and the assignment of the lease, the area is described as "within a radius of five hundred yards."

In Webster's New International Dictionary (2d ed.) 2053, the word "radius" is defined as follows:

"A right line extending from the center of a circle or sphere to the curve or surface; the semidiameter of a circle or sphere."

In 1 Restatement of the Law of Contracts 319, § 235 (a), is found the following:

"The ordinary meaning of language throughout the country is given to words unless circumstances show that a different meaning is applicable."

The rule has been applied in construing the word "radius," as contained in restrictive covenants against competition within a certain radius, or as contained in statutes or ordinances.

In 4 Words and Phrases (Eng. ed.) 460, title "radius," appears the following:

"[The appellant was charged by certain informations preferred by the Chief Constable of Cardiff that he, on a certain date, being the proprietor of a motor vehicle, unlawfully used motor fuel for a journey outside a particular 'radius' contrary to the *Motor Fuel* (Hire Service) Order, 1941, made under r. 55 of the Defence (General) Regulations, 1939.] 'There is here no context which suggests any special meaning and no evidence was given that the word "radius" has any special meaning in the motor trade. The word, therefore, should here receive its natural meaning, and in that sense it imputes a circle, so that what is permitted by the Order is a journey within a circle of 15 miles radius having its centre at the place where the vehicle is normally kept. The justices were mistaken in accepting the contentions of the respondent that, the object of the Order being the saving of fuel, the word "radius" was used with an unusual meaning and must be construed as 15 miles by road.' *Langley v. Wilson,* [1943] 2 All E. R. 213, D. C., *per* Lord Caldecote, L. C. J., at p. 214."

In *Cook v. Johnson,* 47 Conn. 175, 36 Am. Rep. 64, it appeared that the plaintiff had bought the defendant's dental practice, and that, by the contract of sale, the vendor agreed not to practice dentistry " 'within a radius of ten miles of said Litchfield.'" This town covered considerable territory, within which the defendant had practiced. The court construed the word "radius" as prohibiting the practice of his profession by the defendant within ten miles of the center of the village of Litchfield.

In *Western Union Tel. Co. v. Jennings,* 98 Tex. 465, 84 S. W. 1056, it was held that, under the company's agree-

ment to deliver messages free within a radius of one-half mile from its office, this line was fixed by a straight line from the office, without regard to distance by the nearest traveled route.

The cases of *Sacks v. Legg*, 219 Ill. App. 144, *Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger*, 181 Md. 295, 29 A. (2d) 653, *Silverman v. Brody*, 65 N. Y. S. (2d) 803, and *Saltman v. Smith*, 313 Mass. 135, 46 N. E. (2d) 550, should also be considered.

In the case of *Johnson v. McIntyre*, 309 Pa. 191, 163 Atl. 290, the supreme court passed upon a question quite similar to that here presented. The plaintiff appealed from a decree dismissing his bill to restrain the defendant from violating the terms of a contract, by which the defendant agreed not to " 'reengage in the practice of medicine and surgery within the radius of fifteen miles from the Borough of Boswell for a period of fifteen years from and after the date of this agreement.' "

The question presented concerned the meaning of the words "within the radius of fifteen miles." The plaintiff, the purchaser of the practice, contended that the words "meant what they said, but the court adopted the view presented by defendant, and held that the words meant a 'distance to be computed by the nearest traveled way.' " We quote again from the opinion:

"By direct line, the distance from the place in Boswell sold by defendant to plaintiff, at which defendant formerly practiced, is 12.2 miles. It is therefore clear that defendant is permanently engaged well within the circle in which he agreed that he would not practice, and from which he agreed to withdraw, and in which he agreed to assist plaintiff in establishing himself."

The opinion continues:

"We cannot assent to the construction of the contract made by the court below. The meaning of the words used to define the territory from which defendant agreed to withdraw is plain, unambiguous and definitive, easily given practical effect. The distance 'by the nearest traveled public way or road' from the Boswell Borough line to defendant's office in Johnstown is 15.4 miles. If the defendant, as

his argument implies, intended to describe a district irregular in shape and extent, as dependent on accessibility by public roads, he should have said so. Such a boundary would necessarily have elements of uncertainty, as there might be dispute about which of several was the nearest traveled public way. These parties expressed themselves clearly in words of plain and simple meaning; that sense is not varied by the context. It is not suggested that there is any mistake about what they intended to say. The court has no power to substitute for 'a radius of fifteen miles' the words 'fifteen miles by the nearest traveled public way or road' because the context and the circumstances exclude such inference. [Citing cases.]"

In the course of the opinion, the court discusses the case of *Kunin v. Weller*, 296 Pa. 161, 145 Atl. 719, cited by the appellee, in which case a restricted area was defined as "within a radius of five city blocks." In the case cited, the court had taken into consideration the fact that "five city blocks" were included in the designation of the restricted area. Indeed, the only distance stated in the restriction was "five city blocks." The court properly distinguished this case, which was nowise inconsistent with the result reached in the case then before the court.

The supreme court reversed the decree appealed from and ordered the bill reinstated, with instructions to restrain the defendant from further violation of his contract.

Cases in which the word "radius" is used in connection with "blocks," "squares," and words of similar import, are not here in point.

The trial court's finding No. 13 reads as follows:

"That at all times herein mentioned it was understood and agreed between the plaintiffs and defendants, and it was the intention of the plaintiffs and defendants that the distance of 500 yards, as set forth in the restrictive covenants contained in the Bill of Sale, and also referred to in the Assignment of Lease, was to be measured by the usual and customary route which human beings could travel, to-wit, by measuring along and upon the streets and sidewalks and not by a direct line."

We find in the evidence no support for this finding.

Each respondent testified that there was never any discussion between them or either of them and appellants as to whether the five hundred yards was to be measured along streets and sidewalks or in a straight line, and appellants testified that no reference was ever made to any such matter in any conversation between them and respondents.

Respondent Mitchell testified that, on one occasion, he was discussing the deal with the "real estate man," and that he was "pretty sure" that Mr. Mead was present; that, in this conversation, the witness referred to the radius of five hundred yards as follows:

"I told him it should be 500 yard distant and he said, 'Well, it is all the same.' So we did not care so very much about it. So we just simply let it go at that time."

This testimony contains no reference to the manner of measuring the distance, as respondents now assert that they then thought the space should be determined. Each respondent stated that the idea that the distance would be measured over streets and sidewalks was his own belief, and not based upon any understanding with appellants nor upon anything which any third party had said. It appears, from all the testimony, that respondents, at the time of the sale, did not expect to again enter the restaurant business and regarded the covenants as of little or no importance.

There is no testimony to the effect that respondents' alleged understanding of the covenants was a mutual construction of the parties. As the record wholly fails to show that both parties to the contract placed upon the word "radius" an interpretation essentially different from its common and ordinary meaning, the trial court erred in holding that the distance of five hundred yards, as agreed by the parties, should be measured along streets or sidewalks and not by an air line.

The next question to be considered is the starting point of the radius to be drawn. The bill of sale provides that respondents should not enter into competition with appellants "within a radius of five hundred (500) yards of the

present location of the Perkins Building," while the assignment of the lease defines the distance as "within a radius of Five Hundred Yards from the existing restaurant."

■ It is the general rule that, in cases where several instruments are executed as part of the same transaction, they should be interpreted or construed together. *Vance v. Ingram,* 16 Wn. (2d) 399, 133 P. (2d) 938.

In the case at bar, while both respondents signed the bill of sale, respondent Anton and wife only executed the assignment of the lease. It is admitted that both respondents took the two documents from Mr. Tollefson's (one of appellants' counsel) office prior to executing the same, and that they remained in respondents' possession for some period of time before respondents signed and acknowledged them. The bill of sale was signed and acknowledged April 6, 1946, and the assignment of the lease April 9th following. The delay in the acknowledgment of the assignment was probably due to the fact that it was necessary for Mr. Anton to obtain the consent of his lessors to the assignment.

Appellants called two licensed surveyors, who testified that they had accurately measured and surveyed the distance between various positions in the Perkins building and the Broadway Sport Center at 739 Broadway. F. R. Worthern testified that the straight-line distance from the northwest outside corner of the Perkins building to the northwest outside corner of the Sport Center is 1,469.73 feet; that, taking as a starting point the center of Anton's Coffee Shop in the Perkins building, all of the Sport Center, save a small triangle on the northwest corner, "approximately eight feet on a side," was within the distance of five hundred yards, and that the southeasterly two thirds of the Sport Center is within a radius of five hundred yards from the center of the Perkins building, the northwest one third of the Sport Center being without that distance.

H. J. Birnie, a surveyor, stated his computations of the three distances, which agreed with Mr. Worthern's figures, save that, according to his measurement from the center of the Perkins building, three fourths of the southeasterly

portion of the Sport Center would fall within the radius of five hundred yards.

Plats were introduced in evidence, bearing the two locations referred to and lines indicating the distances as surveyed.

■ We disregard the survey made from the northwest corner of the Perkins building, as the distance from that point is immaterial. The center of the circle, within which respondents were prohibited from competing with appellants, should be located either at the center of the Perkins building or, more probably, at the center of Anton's Coffee Shop in that building. We do not find it necessary to decide which of these positions should be taken, as, starting from either point, two thirds or more of the Sport Center lie within the prohibited area. Considering the assignment of the lease, all of the considerable area occupied by the Sport Center, save a very small portion in the northwest corner, lies within the five-hundred-yard radius.

We hold that the business, operated for a time by both respondents and, thereafter, by respondent Anton, was so conducted within a radius of five hundred yards from Anton's Coffee Shop, and within the area from which respondents were barred from engaging in a competitive business for the ten-year period.

We shall now consider appellants' assignments of error Nos. 3, 6, and 7.

Respondents argue that, even if the Sport Center lies within the radius of five hundred yards from Anton's Coffee Shop, the agreement between the parties should not be enforced, because the record contains no evidence that respondents entered into competition with appellants.

The trial court found that approximately ninety-eight per cent of appellants' customers are employed in the immediate vicinity of the Perkins building, and that approximately the same percentage of the customers of the Sport Center are employed within two blocks from that restaurant, or are attracted to the Sport Center by the bowling alleys operated on the third floor of the same building, and concluded that the operation of the Sport Center is not in

competition with Anton's Coffee Shop and in no way affects the trade, customers, or business thereof, and that appellants have suffered no damage of any kind or nature as the result of the operation of the Sport Center by respondents.

The foregoing finding of the court is based solely upon evidence introduced by respondents, and even that evidence scarcely supports the finding. In any event, if the agreement between the parties established liquidated damages, the evidence is immaterial.

It is, of course, admitted that the two restaurants are of the same general type, and there can be no doubt that they are competitive in character.

Respondents' agreement that they would not enter into competition with appellants or engage in a competitive business within the radius above referred to, was entered into as a substantial portion of the consideration for the sale of the coffee shop to appellants. How valuable this particular agreement would be to appellants, would depend upon many circumstances; but the agreement was definite, and was made for a large consideration moving to respondents. As above stated, a considerable portion of the purchase price of the coffee shop was paid for the good will of a going business, which respondents had theretofore conducted.

In making such agreements, the parties frequently agree upon a fixed amount to be paid as liquidated damages for breach of the contract, and it is a matter of common knowledge that the extent of damage to one business by competition from another of the same character, is extremely difficult to establish by definite evidence.

Respondents do not contend that the restrictive covenants, which are limited in time to a period of ten years, and in area to a radius of five hundred yards, are unreasonable and, for that reason, unenforcible.

Appellants did not allege any definite amount of damages which they had suffered, and introduced no evidence upon any such question. Evidently, appellants instituted and tried the action upon the theory that, in such a situation as is here presented, it is impossible to ascertain, with rea-

sonable accuracy, the exact amount of damages suffered from competition, and that, under the provisions of the contract between the parties, appellants are entitled to recover, as liquidated damages, the amount agreed upon by the parties.

Apparently, respondents take the position that the covenants should be construed not as they are written but in the light of extraneous circumstances, and that they were intended merely to fix the maximum recovery to be allowed appellants, in case of a breach by respondents. In view of all the circumstances in the case, the covenants cannot be so construed.

Respondents also argue that the contract provides for a penalty, and not for liquidated damages, although the assignment of the lease refers to the stipulated payment as "liquidated damages," and the language of the bill of sale is to the same effect.

The situation is faced squarely in respondents' brief, p. 44, where it is stated that, if it be held that respondents have violated the covenants, appellants are entitled to an injunction, and that, if the provision that, in the event of a breach, respondents "'shall pay $500.00 per month for each month that the breach continues," provides for liquidated damages, appellants are entitled to judgment in accordance with the agreement, even though they have sustained no actual damages; but that, if the provision is, as respondents contend, for the payment of a penalty, then appellants may recover only such damages as they have actually sustained. Respondents, of course, contend that, as the evidence introduced by appellants does not show that they sustained damages, no recovery can be allowed in their favor.

By its finding No. 15, the trial court construed the contract in accordance with respondents' contention.

Provisions in contracts concerning damages, whether liquidated, compensatory, or punitive, have frequently been considered by courts and text writers.

In 1 Restatement of the Law of Contracts 552, § 339, appears the following:

758

"Liquidated Damages and Penalties.

"(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

"(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

"(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation."

On p. 555, appears the following:

"*Illustrations of Subsection* (1):  . . .

"(2) A and B dissolve their mercantile partnership in Trenton, and B contracts that he will not again engage in that business in Trenton for three years 'upon the forfeiture of $1000 to be collected by A as his damages.' The harm caused to A by the competing business of B is incapable of computation with reasonable accuracy even after the breach has occurred; and $1000 is not disproportionate to the size of the business. B [evidently intended for A] is unable to prove that he has suffered any definite loss of profits; and A [evidently intended for B] can not prove with certainty that there has been no such loss. The sum named is liquidated damages and not a penalty."

█ In 15 Am. Jur. 693, Damages, § 260, the following appears, under the general discussion of provisions for liquidated damages or penalties:

"Provisions of the kind under discussion in contracts not to engage in a particular kind of business within certain territory or for a certain length of time are generally held to be for liquidated damages, and not a penalty, where the sum to be paid is reasonable, in view of the difficulty of ascertaining the actual damages which will result from a breach. [Citing cases.]"

(The text continues with consideration of some contracts in which a different rule has been applied.)

In 25 C. J. S. 650, Damages, § 101, the rule is stated as follows:

"As a general rule, a contract may contain a provision fixing the amount to be paid in the event of a breach, where the damages are uncertain in nature or amount or difficult of ascertainment and the amount fixed is fair."

In 3 Williston on Contracts (Rev. ed.) 2217, § 787, appears the following text:

"A stipulated sum for breach of a contract not to compete by one who has sold the good will of a business has generally been enforced. It is obvious that the actual amount of damage in such a case is difficult to estimate even though it be considerable. On the other hand, the breach may be large or small, and stipulated damages of the same amount for a considerable breach and for a small one are not usually permitted. Nevertheless, in this type of case, as has been said, such contracts are generally upheld."

In the case of *Canady v. Knox*, 43 Wash. 567, 86 Pac. 930, this court reversed a judgment entered in favor of defendants, upon sustaining an objection to the introduction of plaintiff's testimony, in an action upon a contract, the complaint alleging the sale of a butchering business for forty-three hundred dollars, the purchaser paying thirty-five hundred dollars and giving a note for the balance. The vendor agreed not to enter the butchering business within a described adjoining territory for the period of three years, under penalty of a "forfeit" to the purchaser in the sum of two thousand dollars. This court, considering the allegations of the complaint and certain admissions in the defendants' answer, reversed the judgment appealed from and remanded the cause for further proceedings. The court noted that the defendants contended that the contract should not be enforced because the sum mentioned appeared to be a penalty and "grossly disproportionate to the actual damages." It was held, as a matter of law, that the sum of two thousand dollars, or almost one half of the purchase price, was not unconscionable, and that the contract, upon its face, appeared to be for liquidated damages. The opinion continues:

"The damages in this case must necessarily be uncertain and difficult, if not impossible, of accurate determination, and therefore come within the rule permitting parties to agree upon what the damages shall be, and the same may be enforced as liquidated damages."

In the case of *Madler v. Silverstone*, 55 Wash. 159, 104 Pac. 165, 34 L. R. A. (N.S.) 1, this court affirmed a judgment in favor of the plaintiffs, who had sued upon a written agreement for exchange of real estate. The contract contained the following provision:

" 'It is understood and agreed that if either of the parties to this contract shall fail to comply with the conditions hereof or to carry out any agreement herein by such party to be performed, such party shall pay and forfeit to the other party the sum of Five hundred ($500) Dollars as liquidated and agreed damages.' "

The agreement was not performed, and the plaintiffs brought suit thereon for recovery of the agreed damages. In the course of the opinion, appears the following:

"Generally speaking, it may be said, that when the damages arising from the breach of the contract which the obligation is given to secure, are uncertain in their nature and not readily susceptible of proof by the ordinary rules of evidence, and are not so disproportionate to the probable damages suffered as to appear unconscionable, and it is reasonably clear from the whole agreement that it is the intention of the parties to provide for liquidated damages and not a penalty, such a stipulation will be held to be one for liquidated damages."

In the recent case of *Foster v. Montgomery Ward & Co.*, 24 Wn. (2d) 248, 163 P. (2d) 838, an action for breach of a contract to purchase apples, this court affirmed a judgment in favor of the plaintiff, holding that, under the contract and the evidence introduced, the plaintiff was entitled to recover from defendant the entire agreed price for the sale of apples, which were not accepted by the defendant, who had agreed to purchase them. The defendant (appellant before this court) contended " 'that the sum claimed by the respondent as stipulated damages is entirely unreasonable and unfair.' " The opinion quotes, from 25 C. J. S. 654, Damages, § 101 c, the text referring to the distinction " 'between a penalty and a provision for liquidated damages.' " In the course of the opinion, this court said:

"In the instant case, it is apparent from the facts that the actual damages suffered by respondent would be difficult

and uncertain if resort to definite proof was compelled, and that the amount specified was not disproportionate to the actual loss. [Followed by a quotation from the case of *Yatsuyanagi v. Shimamura*, 59 Wash. 24, 109 Pac. 282.]"

The trial court's finding No. 15 reads as follows:

"That the stipulated sum of $500.00 per month provided for in the restrictive covenant is out of all proportion to the damages actually sustained or damages that reasonably might be anticipated for breach of such covenant, and under the existing circumstances is unconscionable; that said stipulated sum was not considered or intended by the parties hereto as fair compensation for a breach of said covenant but was inserted therein as a penalty to prevent a breach of said covenant."

This finding is not supported by the evidence, which contains no suggestion that the agreed amount was not considered or intended by the parties as liquidated damages, in case of a breach of the covenants by respondents.

In the recent case of *Merlin v. Rodine*, 32 Wn. (2d) 757, 203 P. (2d) 683, this court said:

"That the parol evidence admitted by the trial court did vary the terms of the written contract seems patent; and that it did not come within any of the recognized exceptions to the parol evidence rule is equally clear. We have consistently held that we cannot, upon general considerations of abstract justice, make a contract for the parties that they did not make for themselves. *Chaffee v. Chaffee*, 19 Wn. (2d) 607, 145 P. (2d) 244, and cases therein cited."

The record before us discloses a state of facts clearly within the classification frequently referred to by the courts, in cases similar to this, in which actual damages in large amounts may be suffered by one party, in the event of breach of a restrictive covenant contained in a contract. Such damages are not susceptible of accurate determination by any trier of the facts. In such cases as this, it is entirely proper for the parties to agree upon an amount to be paid as liquidated damages. Of course, if the amount agreed upon is so large as to bear no reasonable relation to damages actually suffered, courts will not hesitate to

declare that the amount is a penalty and not liquidated damages, but no such situation is here presented.

It cannot be and is not argued that the distance of five hundred yards is unreasonably extensive, nor can it be held that the fact that respondents engaged in business barely within the restricted area requires any modification of the covenants.

At the time of the purchase and sale of the restaurant, appellants were, apparently, inexperienced in business affairs. Respondent Anton had been engaged in the restaurant business in the city of Tacoma for more than twenty years. Respondents had been conducting a successful business. Appellants, who were strangers to the business, were justified in seeking protection from future competition by their vendors, who, of course, had many former satisfied customers and friends in the vicinity. Appellants paid a very substantial price in cash for the business, more than half of which was for good will. The rent paid for the restaurant, under the lease, was six hundred dollars a month. For the first three or four months, the business paid appellants fifteen hundred dollars profit each month. Thereafter, the profit declined to approximately one thousand dollars a month. The record does not contain any evidence concerning the cause of this decline, and appellants did not attempt to introduce evidence which would trace the decline in their profits to competition by respondents, and no presumption may be indulged in to the effect that competition by respondents had anything to do with the matter.

When the sale of the restaurant was accomplished, had the parties failed to agree upon some restriction upon respondents' engaging in the operation of a nearby restaurant, respondents might have done so and, thereby, greatly damaged appellants, or, indeed, ruined their business.

Of course, the nearness of the location of competition is an important but not the only important factor. Other considerations may be involved, such as the surroundings, the character and quality of the food, the prices charged, the general efficiency of the management, and so forth.

Testimony introduced by respondents as to possible damage from competition expresses merely opinions, amounting to little more than guesses.

The trial court's findings in favor of respondents are not supported by the record.

■ The parties entered into a fair agreement, after ample investigation. Appellants were the inexperienced persons, while respondents had been engaged in the restaurant business for many years, and were well acquainted with all phases of the operation of such a business in the city of Tacoma.

We hold that the agreed amount of damages was not unreasonable; that the agreement provides for the recovery of liquidated damages and not a penalty, and that the contract, as executed and accomplished by the parties, should be enforced.

The judgment appealed from is reversed, and the cause remanded with instructions to proceed in accordance with the views herein expressed.

JEFFERS, C. J., STEINERT, MALLERY, and HILL, JJ., concur.