**AMERICAN TRUST COMPANY, a Corporation, Appellant,**

v.

**James G. SMYTH, Collector òf Internal Revenue and United States of America, Appellees.**

No. 15339.

United States Court of Appeals Ninth Circuit.

July 8, 1957.

Brobeck, Phleger & Harrison, Howard J. Fink, Theodore R. Meyer, San Francisco, Cal., Davis, Polk, Wardwell, Sunderland & Kiendl, Montgomery B. Angell, David A. Lindsay, New York City, for appellant.

Charles K. Rice, Asst. Atty. Gen., Homer R. Miller, Hilbert P. Zarky, Attys., Dept. of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., Lynn J. Gillard, Asst. U. S. Atty., San Francisco, Cal., for appellees.

Before ORR, POPE, and FEE, Circuit Judges.

ORR, Circuit Judge.

Appellant, as trustee of a testamentary trust created by the will of Harry L. Tevis, paid a tax in the sum of $570,-957.86 on its fiduciary income for the trust for the year 1946. A claim for refund was seasonably filed and was thereafter disallowed by the Commissioner of Internal Revenue. This suit for refund followed. The trial court denied relief.

Tevis died on July 19, 1931, in Santa Clara County, California, where his will was duly probated and the trust in question created. The trust required the rents, issues and profits of the trust estate to be paid in equal shares to the children of the testator's niece, Florence Fermor-Hesketh, born prior to the decedent's death, or to their survivors, during their lives. During 1946 the four living beneficiaries of the trust were domiciled and residents of the United Kingdom.[1] A portion of the trust is to terminate upon the death of each of the four beneficiaries.

During 1946 the trustee, a California corporation, sold certain shares of stock from the corpus of the trust, thereby realizing a long-term capital gain. Under the terms of the trust, and the law of California, this capital gain was allocated to the corpus, there to be held until distribution upon termination of the trust. If any income taxes on the capital gain could be legally assessed, it would be chargeable to the corpus.

The problem for solution is: was the capital gain here involved exempt from United States income tax by virtue of Article XIV of Income Tax Convention between the United States and the United Kingdom of Great Britain and Northern Ireland, signed April 16, 1945, effective January 1, 1945, 60 Stat. 1377, hereafter the "Treaty".

Article XIV of the Treaty provided:

"A resident of the United Kingdom not engaged in trade or business in the United States shall be exempt from United States tax on gains from the sale or exchange of capital assets."

It is agreed that the beneficiaries were not engaged in trade or business in the United States during 1946.

§ 22(b) (7), Internal Revenue Code of 1939, 26 U.S.C.A. § 22(b) (7), provided:

"(b) Exclusions from gross income. The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * *

"(7) Income exempt under treaty. Income of any kind, to the extent required by any treaty obligation of the United States."

The following Treasury Regulation was in force and effect in 1946:[2]

"Sec. 7.519 Exemption from, or reduction in rate of, United States Tax in the Case of Dividends, Interest, Royalties, Natural Resource Royalties, and Real Property Rentals.

* * * * * *

"*Beneficiaries of an estate or trust.*—A nonresident alien who is a resident of the United Kingdom and who is a beneficiary of a domestic estate or trust shall be entitled to the exemption, or reduction in the rate of tax, as the case may be, provided in Articles VI, VII, VIII, IX, and XIV of the convention with respect to dividends, interest, royalties, natural resource royalties, rentals from real property, *and capital gains to the extent such item or items are included in his distributive share of income of such estate or trust* if he is taxable in the United Kingdom on such income and is not engaged in trade or

[1.] When the trust was created, Florence Fermor-Hesketh had five living children who became beneficiaries. One died in 1937, prior to the year in question, and a second child died in 1955.

2. T.D. 5569, Section 7.519(c), 1947–2 Cum.Bull. 100,114.

business in the United States through a permanent establishment. * * *" (Italics supplied.)

The Government contends that while the Treaty exempts the capital gains tax on the distributive share of the British beneficiaries, it does not extend the exemption to the trust which, it is urged, is a separate taxable entity under the Internal Revenue Code. The Government's argument is bottomed upon the theory that the capital gain resulting from the sale of trust property was not income of the beneficiaries and remaindermen of the trust, but was income taxable to the trustee. In an attempt to sustain this theory, resort is had to the domestic scheme of taxation in the United States where a trust is conceded to be a distinct taxable entity, subject to taxation upon income which is not currently distributable to the beneficiaries.[3]

Appellant concedes that were it not for the Treaty provision, this argument might be entirely proper, but insists that Article XIV of the Treaty controls and by its terms exempts not only the tax on the capital gain upon the British beneficiaries, but also the tax upon the trust retaining the gain, nothwithstanding absence of a current distribution.

■ We conceive the purpose of the Treaty to have been full reciprocity and equality of tax treatment between nationals of the United States and the United Kingdom. Such being the case, this purpose requires a broad construction of Article XIV, so as to relieve the British beneficiaries from the burden of the capital gains tax to the same extent, in a given situation, as a United States beneficiary would be in a similar position in the United Kingdom.

■ A broad, equitable purpose of the Treaty to exempt capital gains from taxation when a United Kingdom resident would otherwise sustain the burden of the tax directly or indirectly should be given effect without regard to our domestic scheme of taxation, in which the interposition of a bare legal title in the trustee is considered a separate taxable entity. A treaty, being a compact between two sovereigns, must be construed broadly to accomplish the intent of the contracting parties. Such an intent is not consonant with the Government's position in this case.

"Where a treaty admits of two constructions, one restrictive as to the rights, that may be claimed under it, and the other liberal, the latter is to be preferred. Shanks v. Dupont, 3 Pet. 242, 7 L.Ed. 666. Such is the settled rule in this court." Hauenstein v. Lynham, 1879, 100 U.S. 483, 487, 25 L.Ed. 628.

"In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred. Jordan v. K. Tashiro, 278 U.S. 123, 127, 49 S.Ct. 47, 73 L.Ed. 214; Geofroy v. Riggs, 133 U.S. 258, 271, 10 S.Ct. 295, 33 L.Ed. 642; In re Ross, 140 U.S. 453, 475, 11 S.Ct. 897, 35 L.Ed. 581; Tucker v. Alexandroff, 183 U.S. 424, 437, 22

---

3. § 161 of the Internal Revenue Code of 1939 provided that income to trusts would be taxed to the trust the same as it is taxed to individuals, including accumulated income held for future distribution under the terms of a trust. § 162(b) allowed a deduction to the trust for income of the year which is currently distributable to the beneficiaries. 26 U.S. C.A. §§ 161, 162(b).

S.Ct. 195, 46 L.Ed. 264; Asakura v. City of Seattle, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041." Factor v. Laubenheimer, 1933, 290 U.S. 276, 293, 54 S.Ct. 191, 195, 78 L.Ed. 315.

■ This is also true as to the Income Tax Convention, its purpose being to secure reciprocity and equality of tax treatment between the nationals of the two contracting parties. The Income Tax Convention between the United States and the United Kingdom has the status of a treaty, and consequently, is "the supreme Law of the Land." U.S.Const., art. VI, cl. 2.

■ In construing the terms of the Treaty, we are constrained to look "within the four corners of the Treaty" keeping in mind the purpose of the contracting parties. Any resort to domestic law must be derived from the express terms of the Treaty itself. Article II(3) of the Treaty provides:

"In the application of the provisions of the present Convention by one of the Contracting Parties any term not otherwise defined shall, unless the context otherwise requires, have the meaning which it has under the laws of that Contracting Party relating to the taxes which are the subject of the present Convention."

■ The precise provisions of Article XIV, viz.: "resident of the United Kingdom" is specifically defined by the Treaty;[4] "gains from the sale or exchange of capital assets" has a special meaning derived from both statute and judicial decision in United States tax law. But "exempt" is nowhere defined in the Treaty, nor in the Internal Revenue Code of 1939. Therefore, we are required to construe the term "exempt" in accordance with what we believe to be the intent of the contracting parties, in order to achieve reciprocity between similarly situated United States and United Kingdom taxpayers.

■ We think "exempt" was employed in its broadest meaning, signifying a release from economic burden. If the capital gains tax is imposed on the trust in the instant case, the United Kingdom beneficiaries and remaindermen are burdened economically with the United States tax, as it diminishes both their respective incomes and corpus distributions.

We are not persuaded that the contracting parties intended such an economic burden be placed on United Kingdom taxpayers, when in a similar situation a United States income beneficiary or remainderman would not have a similar burden arising from United Kingdom taxation.

A study of the Articles of the Convention indicates an attempt to achieve a thoroughgoing reciprocity between the two nations' taxpayers in similar situations. Upon its face Article XIV does not portray any concession by the United Kingdom. The policy of reciprocity is apparent, however, when it is realized that the United Kingdom does not impose an income tax upon capital gains; it is obvious there was no occasion for any express concession on this point by it.

The exemption found in Article XIV is not solely limited to a United Kingdom resident who would report and pay the tax. An analogous situation occurs when a United Kingdom resident holding legal title to a capital asset located in the United States sells it at a gain; in such a situation there is no question but that he would be exempt under Article XIV. Then, if the broad and overriding intent of the contracting parties to achieve reciprocity is to be given ef-

---

**4.** Art. II(1) (g) reads: "The term 'resident of the United Kingdom' means any person (other than a citizen of the United States or a United States corporation) who is resident in the United Kingdom for the purposes of United Kingdom tax and not resident in the United States for the purposes of United States tax. A corporation is to be regarded as resident in the United Kingdom if its business is managed and controlled in the United Kingdom."

fect, how can a distinction reasonably be made where the United Kingdom resident has equitable ownership?

The Government's contention that the trust is a separate taxable entity under domestic law and hence not a resident of the United Kingdom, is rather finely drawn and entirely overlooks the evident purpose of the Treaty. The phrase "A resident of the United Kingdom" found in Article XIV, and defined in Article II(1) (g),[5] does not refer to concepts of tax entities under American domestic tax law. The relevant concept is the economics burden upon the individual taxpayer,[6] and the chief purpose of the Treaty is relief from the economic burden of double taxation. The Proclamation preceding the Treaty, which reads:

"Desiring to conclude a Convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, * * *"

sustains our conclusion.

Article XIV exempted the tax upon the capital gain to the trust. The intervention of a trust and trustee having legal title did not contradict the pattern of reciprocal taxation and impose an unintended economic burden.

The fact that the Income Tax Convention between the United States and the United Kingdom does not contain a "savings clause" found in sixteen of twenty Tax Conventions negotiated by the United States is significant.[7] Treaties containing the usual "savings clause" were negotiated both before and after the United Kingdom Treaty. The purpose of the "saving clause", as we read it, was to make plain that the United States reserved the right to include all items of income taxable under its revenue laws. Hence, were we here dealing with a treaty containing a savings clause, a different result might possibly be reached. Thus, it seems that the savings clause was incorporated into certain treaties with the express purpose of limiting exemptions. Its omission from the United Kingdom Treaty is further evidence of a purpose to exempt completely income from capital gains belonging to residents of the United Kingdom, regardless of where lodged between the time of receipt and distribution.

Reversed.

5. See note 4, supra.

6. See Article VI of the Treaty for the treatment of corporate dividends, where the crucial principle involves economic burden upon individuals. Reciprocity is achieved by reducing the United States withholding tax on dividends received by United Kingdom residents, and exempting dividends received by United States residents from the United Kingdom surtax.

7. A typical "savings clause" is found in the Income Tax Convention between the United States and Sweden, 1940, 54 Stat. 1759, wherein Art. XIV reads:
   "It is agreed that double taxation shall be avoided in the following manner:
   "(a) Notwithstanding any other provision of this convention, the United States of America in determining the income and excess-profits taxes, including all surtaxes, of its citizens or residents or corporations, may include in the basis upon which such taxes are imposed all items of income taxable under the revenue laws of the United States of America as though this Convention had not come into effect. The United States of America shall, however, deduct the amount of the taxes specified in Article I(b) (1) and (3) of this Convention or other like taxes from the income tax thus computed but not in excess of that portion of the income tax liability which the taxpayer's net income taxable in Sweden bears to his entire net income."
   The following tax conventions contain a typical savings clause, as set out above: Canada, 1941; France, 1945; Sweden, 1940; Union of South Africa, 1946; Denmark, 1948; Netherlands, 1947; Belgium, 1953; Norway, 1951; Greece, 1953; Switzerland, 1951; Finland, 1952; Japan, 1955; Federal Republic of Germany, 1954; Italy, 1956; Honduras, 1957; Austria, Exchange of ratifications not yet made. No savings clause is found in the following tax conventions: United Kingdom, 1945; New Zealand, 1951; Ireland, 1951; Australia, 1953.