**OREGON–PACIFIC FOREST PRODUCTS CORPORATION, a corporation, Plaintiff,**

v.

**WELSH PANEL COMPANY, a corporation, Mitsui & Co., Ltd., a corporation, Mitsubishi International Corporation, a corporation, and C. Itoh & Co. (America), Inc., a corporation, Defendants.**

Civ. No. 65–78.

United States District Court
D. Oregon.

Oct. 12, 1965.

Curtis W. Cutsforth, King, Miller, Anderson, Nash & Yerke, Portland, Or., for plaintiff.

Erskine Wood, Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for Mitsui & Co., Ltd.

KILKENNY, District Judge.

Before the court is the segregated issue on whether the action should be stayed, while the dispute is arbitrated pursuant to an arbitration clause in certain contracts between plaintiff and defendant Mitsui. Plaintiff, while conced-

ing the existence of the arbitration clause, claims: (1) that the contracts were oral in the first instance, and that there was no consideration for the signing of the written instruments; (2) that the arbitration clause was in "fine print" on the reverse side of the contract and that the parties never intended that such clause should be incorporated; (3) that even if five of the contracts are valid, the remaining five were signed under different circumstances and invalid; (4) that Patrick Connolly, the agent who signed the contracts, was acting outside of the scope of his authority.

For some time prior to the transactions in question, plaintiff was engaged in the business of purchasing quantities of Japanese oak plywood from certain suppliers and, in turn, sold the material to defendant Welsh. One of these suppliers was Mitsui. Of the forty to fifty transactions between these parties, only ten are here in dispute.

(1) The record shows that each transaction was initiated by a telephone conversation between Connolly, as agent of plaintiff, and Yasanobu, a representative of Mitsui. In general, the terms and conditions of the sale were discussed in these conversations. On most occasions following these conversations, Connolly would forward to Yasanobu in Seattle, a document designated a purchase order, which carried a place for its acceptance. Thereafter, in most instances, Mitsui, through its agent, indicated an acceptance on the purchase order and at the same time signed and forwarded to Connolly its form of contract which incorporated, on the reverse side, the arbitration clause in question.[1]

■ Although the purchase order contained language which confirmed the phone call,[2] gave an adequate description of the property purchased and of the purchase price, with the request that the same be signed and the duplicate copy returned, the fact remains that Mitsui insisted on the signing of its own form of contract, which contained the arbitration clause. Here, we have a classical example of negotiations leading up to the signing of a final contract. Each purchase order forwarded by plaintiff clearly indicated that the duplicate copy should be signed and returned. This purchase order amounted to nothing more than an offer on behalf of plaintiff to purchase the materials at the price indicated. In turn, Mitsui made a counteroffer on its own form of contract which confirmed the sale to plaintiff.[3] This confirmation contract made specific reference to the terms and conditions on its reverse side,[4] which terms included the arbitration agreement. The reference is prominently displayed at the bottom of the instrument, at the place where the signature of plaintiff was required. Consequently, we have a general pattern on practically all of the contracts of: (1) a telephone discussion; (2) an offer by plaintiff on its form of purchase order; (3) a coun-

---

1.

＊　　＊　　＊　　＊　　＊

"10. Any claims by Buyer of whatever nature arising under this contract shall be made by cable within thirty (30) days after arrival of the merchandise at the destination specified in the bills of lading. * * * Settlement of such claim or any disputes will be effected by agreement of the parties as promptly as possible, but, failing amicable settlement, will be submitted to two arbitrators, one appointed by each of the parties hereto, and the two arbitrators so chosen shall, if unable to agree, choose a third arbitrator as umpire without unnecessary delay. The decision in writing signed by those assenting thereto of any two of the ar-

bitrators shall be final and binding on the parties hereto. Arbitration under this provision shall be carried out in Japan, and the costs thereof, including compensation to the arbitrators, will be borne by the party against whom the award is made."

＊　　＊　　＊　　＊　　＊

2. (Typical language.)
"Confirmed phone call with: Bob Yasanobu/Pat Connolly."

3. "This is to confirm our sale to you, and your purchase from us of the under mentioned goods subject to the following terms and conditions: * * *."

4. "Subject to the general terms and conditions set forth on back hereof: * * *."

teroffer by Mitsui on its form of contract; (4) an acceptance by plaintiff of Mitsui's counteroffer by the signing and forwarding of a copy to Mitsui. It is a general rule that the acceptance of an offer must be positive, unconditional, unequivocal and unambiguous, and must not change, add to, or qualify the terms of the offer. C. R. Shaw Wholesale Co. v. Hackbarth, 102 Or. 80, 198 P. 908, 201 P. 1066 (1921); Wagner v. Rainier Mfg. Co., 230 Or. 531, 371 P.2d 74 (1962). It is my considered judgment that the final agreements between these parties embodied the terms and conditions of the original offers in writing made by the plaintiff and the counteroffers by Mitsui, and its acceptance by plaintiff. These instruments must be construed together.

▇▇ The course of conduct pursued by parties in the performance of contracts, and especially where the performance covers a considerable period of time and involves extensive efforts, is frequently a reliable exponent of the contract's meaning. Perkins v. Standard Oil Co., 235 Or. 7, 383 P.2d 107, modification denied 383 P.2d 1002 (1963). Two or more instruments, executed contemporaneously by the same parties in reference to the same subject matter, constitutes but one contract. Lowe v. Harmon, 167 Or. 128, 115 P.2d 297 (1941); Mead v. Anton, 33 Wash.2d 741, 207 P.2d 227, 10 A.L.R.2d 588 (1949); McLeod v. Despain, 49 Or. 536, 90 P. 492, 92 P. 1088, 19 L.R.A.,N.S., 276 (1907).

▇ Two instruments relating to the sale of specific goods which was part of the same transaction, would be construed together for the purpose of showing the true contract, notwithstanding they were executed on successive days. Pulkrabek v. Bankers Mortgage Corp., 115 Or. 379, 238 P. 347 (1925).

▇▇ On the record before me, I can make no finding other than that the parties intended to finalize their negotiations by each signing both contracts, and that the terms and conditions incorporated in those contracts was the final arrangement and agreement between the parties. The conduct of the parties in following the same pattern in closing forty to fifty transactions, permits of no other conclusion. The contracts must be construed as a whole, and effect given, if possible, to every word and phrase. Fendall v. Miller, 99 Or. 610, 196 P. 381 (1921); Hardin v. Dimension Lumber Co., 140 Or. 385, 13 P.2d 602 (1932). Plaintiff's arguments that the original telephone conversation constituted a valid contract and that the court should not go beyond that arrangement, is tenuous in the extreme. First, the fact is that the parties themselves did not consider the telephone conversation as a contract. Second, sound business practice would dictate the reduction of the telephone discussion to a writing. Third, the statute of fraud section of the Uniform Sales Act [5] requires that the terms of such a transaction be reduced to writing. The parties would be presumed to know that law. The parties never intended the telephone conversation to constitute a binding contract, and I so find.

(2) During the course of the trial, I permitted the witness Connolly to testify as to his lack of knowledge of the terms and conditions on the reverse side of the final contract even though at that time, I felt that the Parol Evidence Rule might prevent me from considering such evidence.

▇▇ Here, with one exception, each of Mitsui's forms of contract was signed by plaintiff through its agent, Connolly. The purpose of a signature to a contract is to express agreement to, and, acceptance of, the terms and conditions of the instrument. Title & Trust Co. v. Nelson, 157 Or. 585, 71 P.2d 1081, 114 A.L.R. 1196 (1937). The fact that one of these contracts was signed in Connolly's name by his secretary, under the facts and circumstances of this case, is of no importance. The fact is that the contract was accepted and acted on by the plain-

5. ORS 72.2010.

tiff. J. I. Case Threshing Machine Co. v. Smith, 16 Or. 381, 18 P. 641 (1888).

▆▆▆▆▆ If the evidence offered by plaintiff that Connolly, in spite of the cautionary language on the face of the contract, did not read the language on the reverse side, including the arbitration clause, is to be considered by the court, this evidence must fall within one of the exceptions to the Rule.[6] I use the Oregon statute and the Oregon decisional law on the subject, for the reason that the contract, containing the arbitration clause, was finally accepted and approved by the plaintiff in the state of Oregon. True enough, this contract was prepared in Washington and there first signed by Mitsui. In any event, the Washington law does not differ from the Oregon law on the subject. The final signing by plaintiff was in Oregon. It is no defense that a party, seeking to avoid the contract, did not read it. The only exceptions to the Rule are: (1) the use of parol evidence of the circumstances under which the agreement was made, including the situation of the subject and of the parties; (2) to explain an ambiguity; (3) to establish illegality or fraud. The evidence offered by plaintiff does not fall within any one of these exceptions. Parol evidence is inadmissible to contradict, add to, detract from, or vary a written contract which is clear and explicit and contains no ambiguities. The writing or writings adopted by the parties as the final and complete expression of their agreement constitutes the "integration of the agreement." Webster v. Harris, 189 Or. 671, 22 P.2d 644 (1950). As recently as 1962, the Oregon Supreme Court said that where the parties entered into a complete contract, which has been reduced to writing, the whole engagement is conclusively presumed to have been included, with extrinsic evidence inadmissible to add to, subtract from, alter, vary or contradict written contract or control its legal operation or effect. Barnstable v. United States National Bank, 232 Or. 36, 374 P.2d 386 (1962). The intention of the parties, as evidenced by the legal import of the language of the written contract, cannot be varied by parol proof of a different intention. United States National Bank of La Grande v. Miller, 122 Or. 285, 295, 258 P. 205, 58 A.L.R. 339 (1927); Delaware Indians v. Cherokee Nation, 193 U.S. 127, 24 S.Ct. 342, 48 L.Ed. 646 (1904). The intention of the parties must be gathered from the instrument itself, giving consideration to the circumstances existing at the time of execution. O'Gorman v. Baker, 219 Or. 170, 189, 338 P.2d 638, 347 P.2d 85, 87 (1959). The rule under scrutiny is one of substantive law, rather than one of evidence. Webster v. Harris, 189 Or. 671, 222 P.2d 644 (1950). A court is not permitted to look behind the clear wording of the contract to discover an undisclosed intent. Weyerhaeuser Timber Co. v. State Unemployment Compensation Comm'n, 217 Or. 378, 391, 342 P.2d 114 (1959).

The cases cited by plaintiff: such as Caldwell v. Wells, 228 Or. 389, 365 P.2d 505 (1961); Dorsey v. Tisby, 192 Or. 163, 234 P.2d 557 (1951); Langendorf United Bakeries, Inc. v. Moore, 327 F.2d 592 (9th Cir. 1964), deal with separate oral contracts in connection with a subject matter independent of the writing. Here, we have no such a factual background. The parties had no oral conversations other than those on the telephone. Here, aside from the original conversations, the plaintiff claims no separate oral agreement. Likewise, the Washington cases such as Bond v. Wiegardt, 36 Wash.2d 41, 216 P.2d 196 (1950), and Barber v. Rochester, 52 Wash.2d 691, 328 P.2d 711 (1958), are of no help to plaintiff. Here, there is no claim that the contract was partly oral and partly in writing. For that matter, I have already held that all of the oral understandings were merged into the writings. The Washington cases cited by plaintiff recognize the stringency of the Rule.

Finally, Connolly's testimony on his "intent" amounts to nothing more than

6. ORS 41.740.

a general statement that he had no thought, one way or the other, on the subject of arbitration. He knew of the provisions on the reverse side of the contract, but never took time to read them. Obviously, as to those provisions, he could have no personal intent. I find for defendant Mitsui on this issue, both on the law and on the facts.

(3) On this issue, even though not raised in the pretrial order, plaintiff claims that in three of the transactions, Mitsui's representative in Seattle signed and returned the Oregon Pacific purchase order form before Mr. Connolly signed the Mitsui documents relating to such transactions. Consequently, it is argued the purchase orders on the plaintiff's form then were valid and subsisting contracts and the later signing by Connolly of the Mitsui form is of no significance, there being no consideration for the extra promises contained in the Mitsui contract. The reverse argument is made on two of the other contracts where the plaintiff's form was signed sometime after the signing of the Mitsui form.

I have already discussed this subject in considerable detail under Point (1) where I found that the parties followed a set pattern on the exchange and signing of these and some thirty or forty additional instruments on their different transactions. It is clear that each of the parties insisted on the other signing the two forms of contract. Their course of conduct shows, rather conclusively, that they intended to use the two forms. If, on occasion, one form was signed a short time after the delivery of the other, that fact is of no importance when viewed in the light of the circumstances here existing. This contention is totally lacking in substance.

(4) Plaintiff's contention that Connolly lacked authority to sign a contract containing an arbitration agreement is the weakest of all. To be kept in mind is the fact that he signed on behalf of the plaintiff some forty or fifty of these agreements. A duplicate original was kept in the files of the plaintiff and all of the material, the subject of the contracts, was delivered to plaintiff on the strength of this agreement and its counterpart, the purchase order form of plaintiff. Plaintiff concedes that an arbitration clause may be a usual and customary provision in a contract, but contends that a provision to arbitrate in Japan is not customary, nor usual. Arbitration is recognized by federal legislation. 9 U.S.C. §§ 1–14.

In passing on the validity of, and in construing an arbitration clause, the courts are governed by the Federal Arbitration Act, and the decisional law of the federal courts interpreting such act. American Air Lines, Inc. v. Louisville & Jefferson C.A.B., 269 F.2d 811 (6th Cir. 1959); Robert Lawrence Co., Inc. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959), and on such construction any doubt should be resolved in line with the liberal policy of promoting arbitration by speedy and relatively inexpensive trial before commercial specialists and to help ease the congestion of court calendars. World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362 (2d Cir. 1965). There is no inconsistency between the provisions of the Federal Arbitration Act and the Parol Evidence Rule, or other law, as applied by the courts of the states of Oregon and Washington.

Connolly occupied the important position of manager of the import department of the plaintiff for approximately two years. In his own language, he was in charge of the whole operation "lock, stock and barrel." Douglas, Connolly's superior, checked Connolly's operations and completely trusted him. It is crystal clear that Connolly was the only one in plaintiff's organization to whom it looked for action in connection with its import purchases. Beyond question, plaintiff represented to Mitsui that Connolly had authority to make a contract of purchase. Not only did he execute the contracts in question, but also signed many others, identical in terms. That Mitsui was entitled to rely on the apparent authority of Connolly,

is settled beyond question. Sherman, Clay & Co. v. Buffum & Pendleton, 91 Or. 352, 179 P. 241 (1919); Brace v. Northern Pac. Ry. Co., 63 Wash. 417, 115 P. 841, 38 L.R.A.,N.S., 1135 (1911); State Farm Mutual Auto Ins. Co. v. Porter, 186 F.2d 834 (9th Cir. 1951). Another statement of the rule is that a person who knows that the agent of a corporation habitually transacts certain kinds of business for such corporation under circumstances which necessarily show knowledge on the part of those charged with the conduct of the corporate business, has a right to assume that such agent is acting within the scope of his authority. Brace v. Northern Pac. Ry. Co., supra; Sherman, Clay & Co. v. Buffum & Pendleton, supra. That Connolly was acting within the course and scope of his apparent authority, is so clear that it is unnecessary to comment on the inconsistency of plaintiff's position in instituting an action on the contract and then attempting to repudiate one of its important provisions.

 The argument that the agreement to arbitrate the claim in Japan is such an unusual and extraordinary undertaking, that it cannot be viewed within Connolly's apparent authority, is fundamentally unsound. The plaintiff's officers, including Connolly, knew they were dealing with a business concern in Japan. For better or for worse, plaintiff is presumed to know the provisions of the Treaty of Friendship, Commerce and Navigation between the United States and Japan (April 2, 1953), which provided, among other things:

"Contracts entered into between Nationals and companies of either party and Nationals and companies of the other party, that provide for the settlement *by arbitration* of controversies, shall not be deemed unenforceable within the territories of such other party merely on the grounds that the place designated for the arbitration proceedings is outside such territories, or that the nationality of one or more of the arbitrators is not that of such other party."

 All nationals of the United States, including plaintiff, are bound by this provision. This treaty, insofar as it affects the parties, is read into and becomes a part of the contract. A treaty is the supreme law of the land. American Trust Co. v. Smyth, 247 F.2d 149 (9th Cir. 1957); Z & F Assets Realization Corp. v. Hull, 72 App.D.C. 234, 114 F.2d 464 (1940), cert. granted 311 U.S. 632, 61 S.Ct. 51, 85 L.Ed. 402, aff'd 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941). Even a state law must yield, when it is inconsistent with or impairs the policy or provisions of a treaty, and a state has no power to refuse enforcement of rights based on a federal policy which is evidenced by an international compact or agreement. United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

This opinion shall serve as my findings and conclusions. Any party, if it desires, may request additional findings. An appropriate order staying this action shall be prepared, served and presented by counsel for defendant Mitsui.

I am of the opinion that the order staying the proceedings in this cause, involves a controlling question of law as to which there is substantial ground for a difference of opinion, and that an immediate appeal from the order may materially advance the ultimate determination of this litigation. I so certify in accordance with the provisions of 28 U.S.C. § 1292(4) (b). A similar statement and certificate shall be included in the order staying the proceedings.