This bill is brought under the general authority of the court of chancery to instruct testamentary trustees, and more particularly under the provisions of R.S. 3:19-1 to 4, to obtain approval of certain acts already done by such testamentary *Page 532 
trustees. The facts are not in dispute and they, and the relief sought, as appears from the brief of counsel for the guardian adlitem of infant defendants from which this recital is largely taken, are substantially these:
William J. Durfey died testate on September 26th, 1928, a resident of Montclair, Essex county, New Jersey, and in his last will and testament, which was duly probated in Essex county on October 8th, 1928, named Bessie S. Durfey, Helen E. Durfey and Lucretia D. Ash, the executors and trustees thereof. These executors and trustees took upon themselves the administration of said estate and when Bessie S. Durfey died on January 11th, 1933, Philip Goodell was appointed substituted trustee.
Under the terms of his will, the testator created a trust of all his residuary estate and directed his trustees "to pay the net rents, issues, income and profits" from his said estate to his wife, Bessie S. Durfey, for life, should she survive him, and after her death, then to Helen Elizabeth Durfey for life, and on her death to divide the principal among her issue. In the event that the said Helen Elizabeth Durfey should die without issue then the principal was to be paid one-half to testator's nephew, Prentice D. Ash, or his lawful issue, and one-half to testator's niece, Kathryn Ash, or her issue. In the event that either Prentice D. Ash or Kathryn Ash were not living and left no issue at the time they would otherwise have been entitled to take, then the whole estate was to go to either one of them who was living at the time of the death of Helen Elizabeth Durfey, or to the lawful issue of the one who died leaving such issue. In case both Prentice D. Ash and Kathryn Ash had predeceased Helen Elizabeth Durfey and left no issue, then the principal of the estate was to be divided, in equal shares, among the children of the brothers and sisters of the whole blood of testator's wife, Bessie S. Durfey, but one-half of the principal of the estate was to be held in trust for the benefit of testator's sister, Lucretia D. Ash, for life.
The testator's wife, Bessie S. Durfey, survived him, but, as mentioned before, died in January, 1933. Helen Elizabeth Durfey survived both the testator and his wife and is still *Page 533 
living. Others who survived the testator, or have been born since his death, and who are interested in his said estate, and who are presently living, are: Prentice D. Ash, Lucretia D. Ash, Kathryn Ash (now Carlson), Charles F. Ash, 2d, and Peter S. Ash, sons of Prentice D. Ash, Harry Carlson, Jr., Frederick Ash Carlson and Ann Durfey Carlson, children of Kathryn Ash Carlson, and also nine nephews and nieces by testator's widow's brothers and sisters of the whole blood.
The trustees received, as part of the estate, personal property of a total value of $235,395.68, which said property now has a value of approximately $256,533.43. The trustees also acquired title to real estate owned by the testator at the time of his death. This property consisted of his residence in Montclair, New Jersey, which was valued at the time of his death at $50,000; an undivided interest in a vacant property in the State of Washington, of doubtful value; and a half interest in real estate in Brooklyn, New York, hereafter roughly grouped into four parcels, the other half interest in this real estate being owned by testator's sister, Lucretia D. Ash.
The principal parcel in Brooklyn consists of a valuable tract of land, having three street frontages, Flatbush avenue, Seventh avenue and Park Place — and in which testator's interest was valued at $150,000 for federal estate tax purposes.
The second parcel is known as 79, 79A, 81 and 81A Seventh avenue, and the testator's interest therein was valued at $21,500 for federal estate tax purposes.
The third parcel consists of a group of four properties on Fourth avenue between President street and Carroll street and testator's interest therein was valued at $47,500 for federal estate tax purposes.
The fourth parcel is known as 274-280 Wyckoff street, and testator's interest therein was valued at $9,500 for federal estate tax purposes.
The complainants allege that at the time of testator's death the buildings located on the Brooklyn properties were old, in poor condition, and for the most part one-story buildings which were difficult to rent and rented for very little. The buildings located on the second tract have proved fairly profitable *Page 534 
but the rentals received from the buildings on the third tract have scarcely paid the taxes on the property. The building on the fourth tract was vacant at the time of testator's death and has since been condemned by the city authorities and torn down.
The complainants further allege that rentals from the buildings on the first tract have been very low because of economic conditions and the nature and condition of the buildings themselves. The trustees attempted to sell the property but were unsuccessful. They allege that they were advised by competent New York real estate brokers that the only method whereby the property could be utilized was by giving a long term lease and reserving only a ground rent so the tenant could erect a modern building thereon. But the trustees were advised by New York counsel that, as trustees, they could not lease property for a term of more than five years without permission of the New York supreme court. In order to overcome this obstacle, it was suggested that the New York properties be conveyed to a corporation, with the approval of the New York supreme court, and accordingly, on January 31st, 1936, by an order of said court, the trustees were granted permission to form a corporation, to be called Durfey-Ash Corporation, and convey to it the complainants' interest in the Brooklyn properties.
By deed dated October 9th, 1936, the trustees joined with Lucretia D. Ash and conveyed all the Brooklyn properties to the Durfey Ash Corporation and in consideration for such deed, the corporation issued one-half of its capital stock to the trustees and the other half to Lucretia D. Ash and also delivered a $125,000 promissory note to each of the said grantors. Simultaneously with this conveyance, the Durfey-Ash Corporation executed a twenty-one year lease to Seventh Brooklyn Corporation for the first tract. The tenant deposited $30,000 toward the erection of a new building on the property and on October 19th, 1936, a bond and mortgage was executed and delivered by the Durfey-Ash Corporation, as owner of the property, and Seventh Brooklyn Corporation, as tenant, to the Manufacturers Trust Company, payable May 1st, 1940, and bearing interest at six per centum per annum, with *Page 535 
amortization payments of $600 due November 1st, 1937, $600 due May 1st, 1938, and $1,200 every six months thereafter. The said mortgage is now held by the East River Savings Bank, by assignment. The $60,000 received under this mortgage, together with the $30,000 deposited by the Seventh Brooklyn Corporation, was used to complete a modern one-story building occupying the entire tract and containing thirteen stores. Durfey-Ash Corporation received the first year's rent under its lease with Seventh Brooklyn Corporation, namely, $6,666.66, of which $1,000 was paid to Cruikshank Company, brokers, on account of commissions. The tenant paid its proper share of the 1936 taxes and also the mortgage interest due on August 1st, 1937.
Some time before October 1st, 1937, the Seventh Brooklyn Corporation notified the Durfey-Ash Corporation that it would be unable to continue the lease, and on October 1st, 1937, it defaulted. Summary proceedings were brought by the Durfey-Ash Corporation in the New York courts and an order was entered therein on October 25th, 1937, terminating the lease and awarding to it possession of the premises in question. Thereafter, the Durfey-Ash Corporation itself made arrangements with the occupants of the property to continue as tenants of the Durfey-Ash Corporation and since then has been receiving a gross rental from the property of $1,510 per month, and in addition has been receiving $166.67 per month from the rental of a bowling alley in the basement.
The first rents received by the Durfey-Ash Corporation were for the month of December, 1937, at which time the corporation was faced with the payment of $5,282 plus interest, for 1937 taxes on the property, a $600 amortization payment and three months' interest on the mortgage, together with other incidental expenses.
In June, 1938, an offer was received to lease the basement of the building on the first tract as a bowling alley, but in order to effect the lease it was necessary that the basement be renovated in accordance with the rules and regulations under the building laws of the city and State of New York. After obtaining estimates on the cost of the improvements and deciding that a bowling alley was not an undesirable *Page 536 
tenant, the trustees arranged a lease between the Durfey-Ash Corporation and the Plaza Bowling Center, Inc. The lease granted a term for fifteen years at an aggregate rental of $42,000, beginning at $2,000 per year. A $5,000 cash deposit, to be applied on future rents, was given Durfey-Ash Corporation, and this, together with personal loans obtained from Lucretia D. Ash, the beneficial owner of one-half of the property, and from Helen E. Durfey, the life tenant, was used to defray the expenses of the improvements.
The net cost of these improvements amounted to $10,928.44. Inasmuch as the Durfey-Ash Corporation has no cash capital, the complainants allege it is necessary that this sum of $10,928.44 be paid into the corporation's treasury so that the corporation may have funds on hand from which the loans made to it can be repaid and so that the sum of $5,000, less broker's commissions, representing the cash deposit for rents, may be kept on hand for application to future rentals in accordance with the provisions of the lease. Lucretia D. Ash has offered to pay into the treasury of the Durfey-Ash Corporation one-half of this amount spent for improvements and so the complainants allege that the principal of the Durfey estate trust fund should contribute the other one-half of the said sum, to wit, the amount of $5,464.22.
As hereinbefore mentioned, the first tract of land in Brooklyn in which William J. Durfey died seized of a one-half interest is encumbered by a $60,000 mortgage, presently held, by assignment, by the East River Savings Bank. This mortgage has been reduced by amortization payments totaling $2,400, but the complainants allege it would be wise, and of benefit to the life tenant and the remaindermen, to pay off the said mortgage as it falls due, or sooner if the mortgagee will accept payment. The mortgagee has so far refused acceleration in payment of the principal, but has indicated its willingness to increase the amortization payments from $1,200 to $1,800 and to reduce the interest rate to five and one-half per centum per annum. In 1938 the said tract, as improved, was assessed at $240,000, and the complainants allege that the property, as it is, will show a return upon the investment substantially equal to the assessment, and several times the mortgage. *Page 537 
Lucretia D. Ash is willing to contribute one-half of the amount necessary to pay the amortization payments which have fallen due, and will fall due in the future, and also one-half of the balance of the mortgage, and the complainants seek permission of this court to charge against the corpus of the Durfey estate similar amounts to reflect the Durfey-Ash Corporation's share. They allege that this share will not exceed $30,000. They further allege that all the debts incurred in making the improvements on the first Brooklyn tract have been paid, that no more improvements will be necessary, and that the property in its present condition will yield sufficient income to maintain it and also afford proper income to the life tenant in proportion to the value of the land.
Relative to the second tract of land in Brooklyn, this was sold by the Durfey-Ash Corporation in October, 1937, for $25,000, $3,000 in cash and the balance by a mortgage. The $3,000 was used to pay brokers' commissions of $625, to make a $1,200 amortization payment on the mortgage on the first tract property, and the balance to defray expenses of the formation of the Durfey-Ash Corporation.
The buildings on the third Brooklyn tract rent for small sums, scarcely paying the taxes on the property, while the buildings on the fourth tract have been torn down, as above mentioned, as a result of condemnation proceedings.
Since the formation of the Durfey-Ash Corporation, it has expended $3,777.95 for fire and public liability insurance on its various properties. Helen E. Durfey, the life tenant, was forty-seven years of age in July, 1938, and during the life of these policies, has an average age expectancy of forty-eight and one-half years. By the table of mortality on female lives published in the chancery rules, her life interest in the property is 47.186 per cent. of the value and the complainants believe that, as a matter of law, the costs of insuring the trust property should be divided between the life tenant and the remaindermen, in the proportion of their several interests, and that 47.186 per cent. of the said insurance premiums should be charged against the rentals received and the balance, or 52.814 per cent., to the extent of a one-half interest *Page 538 
in the property which pertains to the estate owned by the complainants should be paid from the corpus of that estate.
In substance, the relief sought by the complainants as the executors and trustees under testator's will is this:
1. Approval and ratification by this court of the action of the complainant trustees in (a) the formation of the Durfey-Ash Corporation and the conveyance to said corporation of the trustees' one-half interest in the Brooklyn real estate in consideration of the corporation's notes of $125,000 and the issuance of one-half of the corporation's stock to the trustees; (b) arranging for the improvement of the first Brooklyn tract, the twenty-one year lease to Seventh Brooklyn Corporation, and the execution of the $60,000 bond secured by the mortgage now held by the East River Savings Bank; (c) selling through the Durfey-Ash Corporation the second Brooklyn tract for $3,000 cash and a $22,000 mortgage and applying the cash to defray capital expenses of the Durfey-Ash Corporation; (d) taking back the first Brooklyn tract after default by Seventh Brooklyn Corporation; (e) leasing through the Durfey-Ash Corporation the basement of the new building on the first Brooklyn tract for a bowling alley at an aggregate rental of $42,000, after making necessary improvements.
2. Authorization of complainant-trustees to pay out of thecorpus of the estate as expenditures for capital improvements and alterations (a) the sum of $5,464.22, being one-half of the cost of capital improvements; (b) the sum of $600, being one-half of the November 1st, 1938, amortization payment on the mortgage and paid out of rent; (c) one-half of the balance of the principal of the mortgage now held by East River Savings Bank, as it shall become due, or sooner if the mortgagee shall accept payment.
3. Authorization of complainant-trustees to pay through the Durfey-Ash Corporation and out of the corpus of the trust (a) the sum of $997.59, being one-half of 52.814 per cent. of premiums paid for fire and public liability insurance; (b) a proper proportion of future insurance premiums for the same purpose, the cost of such future insurance to be divided between the life tenant and the remaindermen. *Page 539 
The answering defendants, all of whom are remaindermen under testator's will, allege insufficient knowledge on their part to either admit or deny the allegations of complainants' bill of complaint, with the exception of paragraph 18 of said bill, which alleges that the cost of insuring the Brooklyn properties should be divided between the life tenant and the remaindermen. The defendants deny this allegation, and contend that Helen E. Durfey, the life tenant, is entitled to receive only the net
rents, income and profit from the trust estate and that therefore insurance premiums are chargeable against income as an administration expense and not apportionable between the respective estates of the life tenant and the remaindermen.
In his will, the testator conferred these powers upon his executors and trustees:
"I give to my said executors, or their successors or administrators, appointed by the court, full power to bargain and sell, grant and convey, including the power to mortgage and lease, any or all real estate of which I may die seized, and I give my said executors full power to pledge the credit of my estate on bonds, to be secured by mortgage, on any real estate or interest in real estate of which I may die seized.
"In directing my executors to invest my estate in securities approved by law for executors, I wish to make it clear that, while I have in mind that they will ultimately dispose of the real estate which now composes a large part of my estate, and of a large part of which I may die seized, I do not wish them to feel hurried in disposing of the same, and I direct that they shall not dispose of the same until they feel it is to the best advantage of my estate to sell the same, and meantime I expressly authorize them to manage, lease, repair, control and finance the said real estate."
From the foregoing it is evident that the executors could sell or lease the Brooklyn trust properties in any manner felt to be to the best advantage of the estate and the fact that the laws of the State of New York precluded them, as trustees, from executing the type of lease deemed most satisfactory for these properties and that, because of this, a corporation was formed and all the New York trust properties conveyed to it and the desired lease then executed by the corporation, does not violate the terms of testator's will. The Durfey-Ash Corporation is completely controlled by the trustees and *Page 540 
Lucretia D. Ash, owner with the testator of a one-half interest in the properties, and its formation did not alter, except in name only, the respective ownership of the properties by the trustees on one hand and Lucretia D. Ash on the other.
An examination of the several transactions whereby the trustees and Lucretia D. Ash conveyed their respective one-half interests to the corporation and the corporation in turn sold one tract for $3,000 cash and a $22,000 mortgage for the balance of the purchase price, leased another tract (the Flatbush premises) for twenty-one years, receiving a $30,000 cash deposit and executing a $60,000 bond secured by a mortgage for the balance of the cost for the erection of a modern one-story building thereon, subsequently repossessed the latter premises and took over the building when the tenant defaulted, arranged with the sublessees to continue as tenants, collected rents, assumed the amortization payments and interest on the mortgage, and lastly improved the basement of the new building to include a bowling alley and then leased it for fifteen years at an aggregate rental of $42,000, receiving $5,000 cash deposit, depicts the trustees as acting within their testamentary powers and for the best interests of the beneficiaries. There is no doubt in my mind, and no opposition has been made by the defendant-remaindermen, that the trustees, through the Durfey-Ash Corporation, had no alternative but to institute legal proceedings to take back the Flatbush avenue property with its new building. The estate benefited measurably by the $30,000 forfeited by the defaulting tenant. The payment of $600 out of rent for one-half of the amortization payment due on account of the mortgage on the premises was appropriate and as to future payments on the mortgage on account of principal or interest, the trustees, through the Durfey-Ash Corporation, are authorized to make the same out of the corpus
of the estate, for the reason that the liquidation of this mortgage is for the benefit of all persons interested in the testator's estate.
The installation of a bowling alley in the basement of the premises was a business venture on the part of the trustees through the Durfey-Ash Corporation. The building on the premises consists of thirteen stores, eleven of which are occupied, *Page 541 
at a gross rental of $1,510 per month. The basement, at the time the Durfey-Ash Corporation took over the property, was not being used, and the trustees and Lucretia D. Ash, the sole shareholders of the Durfey-Ash Corporation, after being approached by a prospective tenant with an offer to lease it for a bowling alley, decided to make the necessary alterations and improvements. The basement was leased for fifteen years, the monthly rental being $166.67. Inasmuch as such improvements are a benefit to the life tenant and the remaindermen alike, and it having been demonstrated that the bowling alley has produced regular income to the Durfey-Ash Corporation, there is no reason why the act of the trustees, in leasing the basement for such purpose, should not be approved and ratified by this court and payment of one-half the costs for such improvements be made from thecorpus of the estate. Lucretia D. Ash, co-owner with the trustees of the premises, has expressed her willingness to pay one-half share, viz.: $5,464.22 of the total cost of $10,928.44 for such improvements.
Having approved and ratified the acts of the trustees in all the above transactions relative to the properties in New York there remains one point yet to be determined and that pertains to the question of the payment of the insurance premiums on these properties. The trustees feel that the costs of insurance should be apportioned between the life tenant and the remaindermen, but the remaindermen do not share this view and contend that insurance should be paid out of the income of the estate as expenses of administration.
Testator's will contains no specific provision for the payment of insurance premiums on the trust real estate. It provides as follows:
"Second: All the rest, residue and remainder of my estate, real, personal and mixed, wheresoever situated, I give, devise and bequeath to my executors hereinafter named, and to their successors in office, in trust, however, for the following uses and purposes:"
Paragraph "B" of that clause provides:
"During the life of my wife, Bessie S. Durfey, if she survive me, I direct my said executors to pay the net rents, issues, income and profits from my said estate to my said wife, * * *" *Page 542 
and after her death to Helen S. Durfey, for life. The will further expressly directs and authorizes the trustees, after expressing testator's wish that they do not feel hurried in disposing of the real estate, to "manage, lease, repair, control and finance the said real estate."
The cardinal object in construing a will is to arrive at the intention of the testator. In re Vanatta, 99 N.J. Eq. 339, 346;Inman v. Inman, 125 N.J. Eq. 160. To whom did William J. Durfey, the testator, intend insurance premiums on his real estate to be charged — solely to the equitable life tenant, or ratably to the equitable life tenant and the remaindermen in proportion to their several interests?
The answer to this question lies in the fact that testator created a trust of his entire residuary estate rather than devising it outright to the life tenant, with the remainder over. Nor is there any devise of the real property separately from the residue of personalty. In the absence of any indication of the testator's intention in this regard, it might seem, theoretically, that the life tenant should bear the cost of carrying the insurance on his interest and the remaindermen the cost of the insurance on their interest; but it is, however, perhaps more in accord with common experience to suppose that the testator, when he created a trust in his rather extensive residuary estate and expressly authorized his trustees to manage, control and finance it as a single trust, and to pay the "net income" therefrom to the equitable life tenant, contemplated that the cost of insurance on the real estate so held in trust would, like taxes and repairs, be a charge necessary for the maintenance of the estate, and so to be borne by the life tenant.
Ordinary business prudence requires that trustees effect insurance upon trust real estate and it has been held that the costs of such insurance are to be paid out of income as proper expenses and charges concerning matters within the scope of the trustees' authority. Perrine v. Newell, 49 N.J. Eq. 57.
In 26 R.C.L. 1382 § 246, it is stated as the general rule that "taxes and other necessary expenses incurred in the administration of real estate held in trust are chargeable to the income of the trust property, and are not to be paid out *Page 543 
of capital," and it is further stated that "this rule applies to insurance premiums, interest on mortgages, repairs, the payment of premiums on the bonds of the trustees, and all other charges incidental to the management of the trust."
In accord with this view in section 233, Restatement of theLaw of Trusts, which states:
"(1) Except as otherwise provided by the terms of the trust, if property is held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary (a) the former beneficiary is entitled to, and only to, the net income during such period; and (b) the latter beneficiary is entitled to the principal on the expiration of such period.
"(2) The net income is ascertained by subtracting expenditures allowable to income from receipts allocable to income."
In comment "E" to this same section, under the heading "Current Expenses," it is further stated:
"Ordinary current expenses in connection with the administration and management of the trust are payable out of income. These include regularly recurring taxes assessed against any portion of the principal, water rates, premiums on insuranceagainst fire or other casualty, interest on mortgages and other indebtedness, ordinary repairs and the trustees' commissions computed upon income." (Italics mine.)
In Kearney v. Kearney, 17 N.J. Eq. 59; affirmed, Ibid. 504,
cited by complainants, testator devised a life estate in his residence to his wife, remainder over to his son. No trust was involved, and the court held that the life tenant and the remainderman should each pay for the insurance on their respective interests. This case is distinguishable from the present case because it involved no trust estate, as also areEndicott v. Endicott, 41 N.J. Eq. 93, and Rogers v.Genung, 76 Atl. Rep. 233, for the same reason.
The payment of insurance premiums from income accords with the intention of the testator as expressed in his direction that the "net rents, issues, income and profits" of his residuary estate be paid the equitable life tenant. In view of this intent, no distinction between income producing and non-income producing real estate should be made. 26 R.C.L. 1383.
I shall advise a decree in accordance with the foregoing conclusions. *Page 544