*Decision will be entered under Rule 50.*

LAMBERT TREE TRUST ESTATE, CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO AND RONALD LAMBERT TREE, COTRUSTEES, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 76550, 76551, 79756, 79757. Filed June 25, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: Ronald L. and Mary E. Tree, Docket Nos. 76551 and 7,9757; and Lambert Tree Trust Estate, Continental Illinois National Bank and Trust Company of Chicago and Ronald Lambert Tree, Cotrustees, Docket No. 79756.

*Allen H. Gardner, Esq.*, and *Hugh N. Smith, CPA*, for the petitioners.

*Seymour I. Sherman, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in income tax:

| Docket No. | Taxpayer | Year | Deficiency |
|---|---|---|---|
| 76550 | Lambert Tree Trust Estate | 1951 | $1,064.43 |
| | | 1952 | 6,126.07 |
| | | 1953 | 8,847.63 |
| 76551 | Ronald L. and Mary E. Tree | 1951 | 56,062.56 |
| | | 1952 | 87,088.90 |
| | | 1953 | 39,672.60 |
| 79756 | Lambert Tree Trust Estate | 1954 | 53,685.21 |
| 79757 | Ronald L. and Mary E. Tree | 1954 | 93,925.55 |

The issues remaining for our determination are: (1) Whether a prior adjudication by the Court of Claims relative to the proper depreciation deduction by the trust-petitioner is operative to bar respondent from litigation here under the doctrine of collateral estoppel; if not, whether the trustee set aside too much "income" for charity by failing to deduct depreciation in determining the amount

**394**

to be set aside; (2) the proper allocation of the allowable depreciation deduction between the trust and the income beneficiaries; (3) whether the trust-petitioner, as to that portion of its capital gains set aside for noncharitable remaindermen, is entitled to have such capital gains exempt from taxation under the tax convention between the United States and the United Kingdom to the extent that the currently indicated remaindermen are now residents of the United Kingdom and not now engaged in trade or business in the United States.

FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Lambert Tree died October 9, 1910, a resident of Chicago, Illinois. Under his duly probated will the following pertinent provisions were made:

*FOURTEENTH:*—From and after the death of my sister Jeannie Tree Rives, wife of Franklin Rives, I give and bequeath an annuity of six hundred dollars ($600.00) per annum to each of my two nieces Nellie Rives Waters and Isabella Rives, daughters of my said sister, so long as both of them shall be living and continue unmarried, and from and after the death or marriage of either of my said two nieces, I give to the other of my said two nieces an annuity of nine hundred dollars ($900.00) per annum so long as she shall continue to live and remain unmarried; the annuity hereby given to each of my said nieces to cease and be at an end either upon her death or marriage.

*       *       *       *       *       *       *

*TWENTIETH:*—I do hereby give, devise and bequeath unto the said Arthur M. Tree [Lambert's son], Howard G. Grey and the Merchants Loan & Trust Company Bank of Chicago, or to such of them as shall qualify and accept the trust hereby created, and to the survivors and survivor of them and their successors in trust, all the rest, residue and remainder of my estate, real, personal and mixed, of every name and nature and wherever situated, of which I shall die seized and possessed, or to which I may in any way be entitled to at the time of my death, remaining after the payment of my just debts and the expenses of administration, together with such legacies and bequests as are hereinbefore made, except the unaccrued payments on the annuities given by this Will, which from and after the settlement of my estate in the Probate Court shall be paid to the annuitants by my said trustees out of the income of my estate in their hands, subject to the payment of which annuities said estate so vested in said trustees shall be held in trust for the following purposes:—

To pay to my said son Arthur for his use and benefit the net income of said trust estate (subject to the reservation hereinafter in this Will mentioned) until my said grand-son Arthur Ronald shall arrive at the age of thirty (30) years, and if that event happens and the said Arthur Ronald is at the time a man of temperate habits and good moral character, then and thereafter to pay to him, the said Arthur Ronald, one-quarter of the net income of said trust estate, and to my son Arthur the remaining three-quarters of the net income of the said trust estate, for and during the term of his natural life.

Upon the death of my son Arthur the net income derived from said trust estate shall be paid to the said Ronald and any other child or children born in lawful

wedlock of my said son, Arthur, and the survivors of them, from time to time, during the continuance of the trust, in equal shares; provided, however, that in the event of the death of any of my said son's children, born in lawful wedlock as aforesaid, during the continuance of the trust hereby created, leaving issue surviving, such issue shall receive the same share of the income of said trust estate which such deceased child would have been entitled to receive if living; and provided, further, that while any beneficiary entitled to share in said income shall be under the age of thirty (30) years the said trustees shall, out of his or her share of said net income, make a suitable allowance for the support, maintenance and education of such beneficiary, taking into consideration his or her rank and condition in life; and the residue of his or her share of said net income shall be retained and kept invested by said trustees until such beneficiary shall arrive at the age of thirty (30) years, at which age any accumulation of his or her share of said net income shall be paid over and delivered to such beneficiary.

The trust hereby created shall continue until the death of my son Arthur and of the children of my said son Arthur born in lawful wedlock: provided, however, that in any event the trust hereby created shall cease and determine at the expiration of twenty-one (21) [changed to twenty (20) years by codicil] years after the death of the last survivor of my said son and his children born in lawful wedlock prior to my decease.

Upon the termination of the trust hereby created one-half of the trust estate then remaining in the hands of my said trustees shall go to and be distributed between the lawful issue of my said son Arthur, per stirpes, in the same shares and interests in which they would inherit property owned by him if he had died intestate under the laws of the State of Illinois: and in the event that no lawful issue of my said son Arthur, born in lawful wedlock, shall then survive, then one equal half of the said trust estate shall go to my heirs at law. The other equal one-half of said trust estate I give and bequeath to St. Luke's Hospital of the City of Chicago, in the State of Illinois, * * *.

\*       \*       \*       \*       \*       \*       \*

The disposition above provided of the principal and income of said trust estate is subject always to the provision hereinbefore made that all the annuitants hereinbefore provided for shall in any event be first paid out of the income of the said trust estate, and a sufficient amount of the said trust estate shall be retained by said trustees to discharge and pay the said annuities so long as said annuitants, or either of them, shall survive.

Neither my said son Arthur, nor either of his children, or any of their issue, shall have power to anticipate, assign, transfer or otherwise dispose of the whole or any part of the income payable to him or them, or either of them, under the terms and provisions of this article of my will, it being my intention hereby to provide for the comfortable support and maintenance of my said son and his children, and their issue, during the life of the trust hereby created, in the manner and to the extent hereinbefore provided, and which shall not be liable to be diverted from the purposes aforesaid, either by the act of the parties or by process of law.

*TWENTY-FIRST:*—My said trustees are directed to reserve and set aside ten per cent (10%) of the net annual income of the trust estate in their hands under the twentieth article of this will up to sixty thousand dollars ($60,000.00), and twenty per cent (20%) of the excess of the net annual income of said trust estate above sixty thousand dollars ($60,000.00) as a bulding [sic] fund and as a protection against the impairment of said trust estate by accidents or other contingencies. The fund so reserved and set aside shall be known as the Improvement Fund, and the same shall be kept separate, apart and distinct from the residue of said trust estate, and shall be kept invested at interest in

safe securities until the same shall be used in the making of improvements upon real estate owned by said trustees hereunder; provided, however, that in the event that the net annual income from said trust estate shall in any year be less than sixty thousand dollars ($60,000.00), and shall be, in the opinion of the trustees in charge of said fund, insufficient to give the beneficiaries entitled thereto an adequate income to enable them to live according to their position in life, then said trustees shall have the right, in their discretion, to decide what percentage of said income less than ten per cent (10%) shall be reserved and added to said Improvement Fund in such year, having reference to doing justice to my son and his child and children.

The petitioners in Docket Nos. 76550 and 79756 are the duly appointed successor trustees under the above testamentary trust. The trust office of these fiduciaries is in Chicago. The individual trustee, Ronald L. Tree (hereinafter referred to as Ronald), was Arthur M. Tree's only child and Lambert's only grandchild and is the same person as the one designated Arthur Ronald under paragraph 20 of the above will. Ronald was born in 1897. During the years in issue he was receiving all the income distributions of the trust (apart from the specific annuities under paragraph 14).[2] Isabel Rives (hereinafter referred to as Isabel) was then the only party receiving an annuity under paragraph 14. She received $900 per year as provided by Lambert's will.

At all times material St. Luke's Hospital has been within that class of organizations contributions to which are deductible under the provisions of section 23(o) of the Internal Revenue Code of 1939 and section 170 of the Internal Revenue Code of 1954.

The trust corpus consisted almost exclusively of investments in income-producing property, mostly real estate located in the United States and securities of corporations domiciled in the United States. The trust did not operate any of its properties as part of a going business.

The trust and Ronald (jointly with his wife) filed fiduciary and individual income tax returns, respectively, with the district director of internal revenue at Chicago, Illinois, for the years 1951–1954, inclusive.

During the years 1951–1954 the trust received the following amounts of income (after expenses) prior to the inclusion of capital gains, the deductions for depreciation, the deduction for amounts permanently set aside for St. Luke's Hospital, and the deduction for amounts distributable to Isabel and Ronald:

| Year | Income (includes tax-exempt interest) |
| --- | --- |
| 1951 | $282, 162. 52 |
| 1952 | 275, 537. 27 |
| 1953 | 334, 607. 52 |
| 1954 | 148, 077. 48 |

---

[2] Arthur M. Tree, Lambert's son and Ronald's father, had apparently died prior to 1951.

In ascertaining the portions of these amounts to be retained pursuant to paragraph 21 of Lambert's will, the trust based its computation on the theory that these figures were "net income" as that term was used in paragraph 21 of the will and did not further reduce these figures by depreciation [3] on trust property.

The Improvement Fund provided under paragraph 21 of the will was funded by the purchase of bonds which were retained in amounts always greater in value than the credit balance in the fund.

The capital gains earned by the trust were at all times retained by said trust and treated as accretions to trust corpus under the settled practice of trust officers in Illinois. The income beneficiaries of the trust acquiesced in such treatment.

At all times material herein Ronald was a subject of the United Kingdom of Great Britain and Northern Ireland and an alien resident of the United States. Ronald was alive during all the years in issue and has had three children, all born in lawful wedlock and all still living. His two sons are residents and citizens of Great Britain and have never been engaged in trade or business in the United States. We assume, from petitioners' arguments, that the third child, a daughter, was not a resident of Great Britain.

OPINION.

## Issue 1. Charitable Deduction.

Respondent's position on this issue is not altogether clear, but, as we perceive it, his argument is that the trust retained too much in the Improvement Fund created under paragraph 21 of Lambert's will. He maintains that by applying the requisite percentages to "net income" *before* depreciation in ascertaining the proper retention, the trustee violated the directives of the will creating the trust. From this premise it would follow that the deduction under section 642(c)[4] for amounts permanently set aside for St. Luke's Hospital (a qualified charity) is overstated since that section allows the deduction only for amounts permanently set aside pursuant to the terms of the governing instrument.

A. Collateral Estoppel.

Before passing on the question thus presented, we are faced with the question whether the decision of the Court of Claims in *Continen-*

---

[3] The amounts of said depreciation are no longer in dispute.

[4] Unless otherwise noted, all Code references are to the Internal Revenue Code of 1954.
SEC. 642. SPECIAL RULES FOR CREDITS AND DEDUCTIONS.
(c) DEDUCTION FOR AMOUNTS PAID OR PERMANENTLY SET ASIDE FOR A CHARITABLE PURPOSE.—In the case of an estate or trust * * * there shall be allowed as a deduction in computing its taxable income * * * any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid or permanently set aside for a purpose specified in section 170(c), * * *
[Section 162(a), I.R.C. 1939, is identical in substance.]

*tal Illinois Nat. B. & T. Co.* v. *United States*, 18 F. Supp. 229 (Ct. Cl. 1937), operates, under the doctrine of collateral estoppel, to prevent respondent from pressing the issue he here raises. That case involved refund litigation (for tax year 1925) by the same trustees on behalf of the same trust and under the same instrument as is involved here. The opinion in that case did not delineate the issue there presented for decision but we can glean something of the issue raised and decision rendered in that proceeding by the following statement of the court in that case (18 F. Supp. at 234) :

When the Commissioner of Internal Revenue originally determined the plaintiffs' tax liability for the year 1925, he made an error in allowing a deduction of only $6,562 on the interest of the St. Luke's Hospital in the fund of $44,219.10, set up pursuant to the terms of the will of the testator as a building fund and as a protection against the impairment of the corpus of the trust estate. As the will provided that one-half of the trust corpus was to be distributed to St. Luke's Hospital at the termination of the trust, the sum of $22,109.55, set aside to preserve that property, was properly deductible as a gift to an organization operated exclusively for religious, charitable, scientific, literary, or educational purposes. The defendant agrees that this amount is correct but sets up as an *offset* that the Commissioner made another error in his computation which allowed a deduction of the entire amount of depreciation sustained on the trust property in the sum of $31,093.85, whereas he should have allowed only that part of the depreciation which was allocable to the income retained by them and sustained on trust property other than that held for St. Luke's Hospital.

We do not feel that it is necessary to enter into a discussion of this offset as presented by the defendant. The section allowing the charitable deduction * * * provides that the deduction shall be allowed "without limitation." If an adjustment is to be made which affects that allowance, it must be clearly shown that it does not do violence to that section which allows the deduction without limitation. Suffice it to say the Commissioner never made any determination on this point and it was first made in the trial of the case. The evidence produced is not sufficient to bear the burden which the defendant has of sustaining its contention by the preponderance of the evidence.
[Emphasis supplied.]

The defendant's (Commissioner's) claimed offset was thus denied.

The doctrine of res judicata is based upon "considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations." *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). It operates to prevent the same parties (or their privies) from litigating a cause of action which has previously been litigated and decided on its merits. Collateral estoppel is a branch of res judicata and has a narrower scope. It applies to repeated litigation between the same parties in different causes of action and operates to prevent them from relitigating an issue which has been in fact litigated. It does not forbid litigation of issues which *could have*

*been* but in fact were not litigated. *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620 (1933); *Commissioner* v. *Sunnen, supra.* As *Tait* v. *Western Md. Ry. Co.* makes clear, the determination of each year's tax liability involves a separate cause of action. See also *Fairmont Aluminum Co.*, 22 T.C. 1377 (1954), affd. 222 F. 2d 622 (C.A. 4, 1955), certiorari denied 350 U.S. 838 (1955), and authorities there cited. The question for us in the instant case is one of collateral estoppel.

The language quoted from the Court of Claims opinion in the earlier litigation suggests, as respondent here strenuously urges, that the issue there litigated was the proper amount of the depreciation deduction by the trust.[5] The Government there conceded the propriety of the amount retained for the Improvement Fund (see finding of fact 12, 18 F. Supp. at 232) and further conceded that one-half of said amount was allowable as a charitable deduction under a statutory provision identical to 642(c). We conclude that the "offset" of which the court speaks (and which term we have italicized in our excerpt from its opinion) was not an offset of the charitable deduction itself but rather an offset to the refund sought by the taxpayers.[6] That is, the issue was raised much in the manner of a counterclaim. We may pause to wonder how the Government could realistically have been litigating only the narrow question of proper allocation of depreciation when it had consistently (and successfully in *Baltzell* v. *Mitchell*, 3 F. 2d 428 (C.A. 1, 1925), cited in footnote 5) maintained that allocation of the depreciation was not permissible. See also IV–1 C.B. 191; Hearings Before House Ways and Means Committee on Revenue Revision, 1927–1928, pp. 342–345. Nevertheless, the only issue litigated apparently was the proper depreciation deduction.

This difference in approach urged to support the Government's position is enough to compel the conclusion that respondent is not here attempting to litigate the identical issue on which he was unsuccessful in the Court of Claims. *Estate of Florence E. Carr*, 37 T.C. 1173 (1962). The difference in the two issues is more than a mere matter

---

[5] The tax year there involved was 1925 and the law in effect for that year did not permit (or require, as the case may be) the depreciation deduction to be allocated between the income beneficiaries and the trust. Rather, the trust was the only taxpayer entitled to any part of the depreciation deduction. *Baltzell* v. *Mitchell*, 3 F. 2d 428 (C.A. 1, 1925); *United States* v. *Blow*, 77 F. 2d 141 (C.A. 7, 1935). It was not until the 1928 Revenue Act that such allocation was permitted by Congress. See secs. 167(g) and 642(e).

[6] This can never be entirely free from doubt, for the water is here muddied by the circumstance that in its concluding paragraph disposing of the defendant's (Government's) arguments the court said it was rejecting "an adjustment * * * which affects *that* allowance." (Emphasis supplied.) "[T]hat allowance" clearly had reference to the charitable deduction and one reason given for refusing the adjustment was that "The section allowing the charitable deduction * * * provides that the deduction shall be allowed 'without limitation.' " *Continental Illinois Nat. B. & T. Co.* v. *United States*, 18 F. Supp. 229, 234 (Ct. Cl. 1937). This rationale—even if inaccurate—suggests that the court, despite its language, may have been considering the propriety of the charitable deduction itself.

of semantics. Rather, there was—in terms of the law then in effect [7]—
a very real difference, depending upon which of the two positions was
maintained. For had respondent been successful on the theory urged
in the earlier litigation a part of the depreciation deduction would
have been forever lost, and there would have been no change at all in
the tax treatment of the income beneficiaries. On the other hand, had
he successfully challenged the computation of the amount set aside
in the Improvement Fund (on which the charitable deduction was
based), different results would have ensued. Not only would there
have been a decrease in the charitable deduction, but also the amount
then currently distributable to Ronald would have been greater.

In addition, sections 167(g) and 642(e) [8] did effect a change in the
law as it existed in 1925 regarding allocation of depreciation deduc-
tions. See footnote 5, IV–1 C.B. 191, and Hearings Before House
Ways and Means Committee on Revenue Revision, 1927–1928, pp.
342–345. Cf. *Commissioner* v. *Sunnen, supra,* and *San Antonio Tran-
sit Co.,* 30 T.C. 1215, 1217, where we observed, "we can examine a
prior litigated issue where there has been 'a change or development
in the controlling legal principles.' "

We thus hold, from all of the above, that respondent has not pre-
viously litigated the issue as to the proper amount of the charitable
deduction and thus is not here barred by collateral estoppel.

### B. "Net Income" Under Trust Instrument.

We thus proceed to decide on its merits the question whether the
retention by the trust for the Improvement Fund was excessive and
thereby caused the trust to deduct too large an amount on account
of the one-half of this fund which was permanently set aside for
charitable purposes. The solution to this question turns upon the

---

[7] Under the law in effect since the Revenue Act of 1928 (see footnote 5) the difference
is, of course, academic. Respondent's earlier position (denying part of the depreciation
deduction) would still not prejudice the allocation between Ronald and the trust under
current law. Thus, Ronald would benefit from the depreciation deduction against the
amount received (undiminished by depreciation). If respondent were successful in his
position as to the meaning of "net income," Ronald would be taxed upon a share already
diminished by depreciation but would get no further depreciation deduction under 167(g).
Likewise, the tax consequences would be the same to the trust under either view. In
one case it would only get an aliquot portion of the depreciation deduction but would
get a larger distribution deduction. In the other (where "net income" is construed to
mean *after* depreciation) the trust would get all the depreciation deduction but would
get a smaller distribution deduction.

[8] SEC. 167. DEPRECIATION.

(g) LIFE TENANTS AND BENEFICIARIES OF TRUSTS AND ESTATES.—* * * In the case of
property held in trust, the allowable deduction shall be apportioned between the income
beneficiaries and the trustee in accordance with the pertinent provisions of the instrument
creating the trust, or, in the absence of such provisions, on the basis of the trust income
allocable to each. * * *

SEC. 642. SPECIAL RULES FOR CREDITS AND DEDUCTIONS.

(e) DEDUCTION FOR DEPRECIATION AND DEPLETION.—An estate or trust shall be allowed
the deduction for depreciation and depletion only to the extent not allowable to bene-
ficiaries under sections 167(g) and 611(b).

meaning of the term "net income" as used in Lambert's will directing the retention of this fund by the trust.

Whether or not the settlor intended the trustee to set aside a reserve for depreciation before distributing income to beneficiaries (for purposes of this discussion we may treat the fund as a beneficiary receiving portions of income) must be determined from the intention of the settlor as expressed in the governing instrument. In the absence of any direct expressions by the settlor such intention must, of course, be gleaned from a study of the instrument as a whole with careful consideration of the purpose it sought to achieve. The accepted rule in Illinois seems to be that where neither the State law nor the settlor has required otherwise, the trustee is to pay the "net income" beneficiary his share of net income *before* reducing such amount by depreciation.

In *Hopkins* v. *Austin State Bank*, 410 Ill. 67, 101 N.E. 2d 536, 541 (1951), the court rejected plaintiff's contention that the undefined term "net income" meant the gross receipts less, *inter alia*, depreciation as follows:

> Much difficulty could have been avoided if the trust agreement had been so worded as to specify what was meant and intended by the words "net income," * * *. In the absence of express directions to the trustee contained in the trust agreement, where the corpus of the trust is composed of real estate, the term "net income" ordinarily means all of the income remaining from rents, issues and profits, after deducting all the ordinary expenses incurred in connection with the trust estate, or with its administration and management, including annual taxes assessed against the estate, premiums on insurance taken upon the trust property, interest on mortgages, ordinary repairs, water rents, costs of power, light, fuel and janitorial services, the trustee's regular compensation for operating the premises, and other necessary annual expenses of a like nature. All other expenses, including improvements to the real estate, the cost of maintaining, defending or protecting the title to the trust property, principal payments upon mortgages and encumbrances covering the property, are properly charged to principal rather than to income. Cases from other jurisdictions in general accord with this definition of "net income" are Melvin v. Hoffman, 290 Mo. 464, 235 S.W. 107; Mulcahy v. Johnson, 80 Colo. 499, 252 P. 816; and Ash v. Ash, 126 N.J. Eq. 531, 10 A.2d 150. The trial court found that proper accounting procedure, in compliance with the above principles, had been followed in arriving at the net income accrued during the specified periods, and we find nothing in the evidence to sustain the charge that such finding of fact is contrary to the manifest weight of the evidence. * * *

See also *United States* v. *Blow*, 77 F. 2d 141 (C.A. 7, 1935); *In Re Herz' Will*, 7 Misc. 2d 217, 163 N.Y.S. 2d 349 (1957); *In Re Edgar's Will*, 157 Misc. 10, 282 N.Y.S. 795 (1935); *Smith* v. *Keteltas*, 62 App. Div. 174, 70 N.Y.S. 1065 (1901). This rule is often justified upon the theory that the settlor's primary concern is to benefit the life beneficiary rather than remaindermen who are often (as here) unbeknown to him. The principle just announced is especially applicable where, as here, the trust is simply holding its depre-

ciable property for investment rather than as part of a going-business unit.   See 2 Scott, Trusts, sec. 239.4 (1939) ; 2 Bogert, Trusts and Trustees, sec. 600 (2d ed. 1960) ; Note, 60 Harv. L. Rev. 952 (1947).

Beyond these rules, we have here independent evidence of the settlor's intention in the very provision creating the Improvement Fund. The express purpose of this fund was to provide a means for financing improvements of the trust real estate and could well have been considered as a substitute for accumulations of depreciation by the trustees.   The last portion of paragraph 21 of Lambert's will wherein he permits a reduction in the annual retention for the Improvement Fund if net income falls below $60,000 in any year also strongly suggests a primary intent to benefit the life tenant.   We thus conclude that the retentions in the Improvement Fund were proper and that all amounts permanently set aside for charity were in pursuance of the trust instrument.

Moreover, respondent's position is highly illogical when we consider the language of the instrument itself in specifying the charity's remainder interest in the trust (par. 20).   Upon termination of the trust, said instrument gives one-half of the total trust corpus (at its then size) to the charity.   This clearly included all accretions to corpus, whether funded or not.   Manifestly, "net income" distributable to Ronald must be measured by the same standard as is "net income" retained in the Improvement Fund.   Thus, if respondent were correct and we were to hold that too much was retained in the Improvement Fund, we would simply hold that the trust was to retain an amount of income (equal to the total depreciation) in its *general funds.*[9]   This retention would remain part of corpus and still be unalterably committed (one-half) to charity.   We cannot lose sight of the fact that whether the credit balance ultimately appears in a "Reserve for Depreciation" account or in the "Improvement Fund" account, it still represents a reduction in amounts disbursed by the trust and a corresponding increase in the size of the corpus. By whichever method corpus is augmented, the fact remains that half the increase is committed to charity.

---

[9] This observation is justified because respondent appears to make no argument concerning the distribution deduction of the trust and we thus need consider only the question of the proper charitable deduction.   Logically, the distribution deduction should also be affected, since respondent's position on paragraph 21 of the will necessarily implies that the distribution of "net income" to Ronald was too high, and that accordingly his income under 661(a) should be reduced.   See *Freuler* v. *Helvering,* 291 U.S. 35 (1934).   Yet, respondent does not so argue.   Rather, he recognizes that depreciation (for tax purposes) is allocable to Ronald (implying that Ronald's share was properly determined) and thus seems to concede that the trust instrument did not apportion all the depreciation to the trust (under 167(g)).   See sec. 1.167(g)–1(b), Income Tax Regs.   Thus, it would appear that respondent adheres to a hybrid and internally contradictory theory: (a) That for purposes of paragraph 20, Lambert used the term "net income" to mean income before depreciation, but (b) for purposes of paragraph 21 of the same instrument the term meant just the opposite.

*Issue 2. Allocation of Depreciation Between Trust and Beneficiaries.*

The question here is the proper method of allocating the total allowable depreciation deduction between the trust and the beneficiaries thereof. The rule prior to the Revenue Act of 1928 had been that the trust, being the entity with *legal* title to the depreciable assets, was the only taxpayer entitled to any portion of the depreciation deduction, irrespective of whether it would derive any tax benefit therefrom. (See discussion in Issue 1A and footnote 5.) In 1928 Congress was finally prevailed upon to recognize the inherent unfairness in such a rule. Hearings Before House Ways and Means Committee on Revenue Revision, 1927–1928, *supra;* S. Rept. No. 960, 70th Cong., 1st Sess., p. 20. The result was the enactment of section 167(g), *supra*, and 642(e), *supra*, and their statutory predecessors (the provisions of the 1939 Code are identical in substance), under which we must decide the instant problem.

Respondent has recognized that the trust instrument contained no provision respecting the apportionment of depreciation; accordingly, section 167(g) requires allocation on the basis of "trust income allocable to each" (the income beneficiaries and the trust). See sec. 1.167(g)–1(b), Income Tax Regs.; *Charles S. McVeigh*, 3 T.C. 1246, 1260 (1944). The problem would then appear capable of resolution by a simple mathematical computation, the underlying figures being no longer in dispute. However, petitioners, for reasons not altogether clear, allocated the depreciation deduction according to the ratio of income received by the current income beneficiaries (Ronald and Isabel) to that retained by the trust *after* amounts set aside for charity. In effect, petitioners would have us read into section 167(g) the word "taxable" before the words "income beneficiaries." Such reading of the statute has been rejected by the courts. *Charles F. Grey*, 41 B.T.A. 234 (1940), affd. 118 F. 2d 153 (C.A. 7, 1941); *Scott* v. *United States*, 78 F. Supp. 811 (Ct. Cl. 1948). The basic unfairness of petitioners' position was pointed out by the court in the *Scott* case where it was observed (78 F. Supp. at 815):

The effect of plaintiff's contention would be to give him the benefit of depreciation on that part of the property in which he had neither a legal nor an equitable interest. If such position is correct, the settlor of a trust might convey 95 percent of the income to charities and 5 percent to an individual and such an individual, by deducting depreciation on the entire property, might escape taxes altogether. To justify such an inequitable conclusion would require a very clear mandate of the statute. Of course, if the statute shows that as the manifest intention of the Congress we have no choice but to apply it, regardless of the result.

Do the provisions of the statute when read together show this to be the intent of the Congress? We think not.

The court then further observed (p. 815) :

It is the effect of plaintiff's position that the term "income beneficiaries" as here used [sec. 167(g)] refers to taxable income beneficiaries, and that since the charitable beneficiaries are not taxable, it applies in the case at bar only to the individual beneficiaries. A careful reading of the quoted sentence shows otherwise. The term "income beneficiaries" in the first part of the sentence is carried forward with the same meaning into the last expression "on the basis of the trust income allocable to each."

If there had been a provision in the trust instrument that the trustee should set up a reserve for depreciation and distribute the net balance, then charitable beneficiaries would have borne their part of the depreciation and the plaintiff would have received only that part of the depreciation which was allocable to his interest. Since the instrument did not provide for such a reserve, the charitable organizations bore the loss that was occasioned by depreciation in the form of subsequently reduced income. It seems very clear from this provision that plaintiff was entitled only to the depreciation allocable to his interest, and not to his interest plus a corresponding part of the depreciation attributable to the interest of the charitable beneficiaries.

In the *Grey* and *Scott* cases the charity received current distributions of income so that a portion of the depreciation deduction was forever lost. Here, respondent does not seek to deny such portion of the deduction altogether but instead seeks to have it taken completely by the trust rather than partly by Ronald and Isabel. We believe that the rationale of the *Grey* and *Scott* cases clearly requires such an apportionment and we so hold.

### Issue 3. Application of United Kingdom Convention.

The trust-petitioner seeks to avoid the imposition of any Federal income tax upon two-thirds of the one-half portion of its capital gains which it retained for noncharitable beneficiaries. It relies upon the provisions of article XIV of the income tax convention between the United States and the United Kingdom of Great Britain and Northern Ireland (signed Apr. 16, 1945), 1947–2 C.B. 100,[10] which grants exemption from such tax to residents of the United Kingdom not engaged in trade or business in the United States. It appears to be admitted by the trust that *it* is a resident of the United States, cf. *B. W. Jones Trust*, 46 B.T.A. 531 (1942), affd. 132 F. 2d 914 (C.A. 4, 1943), and is not, as an entity, to be considered otherwise simply because certain possible remaindermen currently reside in Great Britain. Cf. Note, 47 A.B.A. J. 635 (1961). However, the trust argues that the framers of the convention intended it to have a broad, remedial scope and that hence we should construe it as being available to the *trust* if the tax burden is *ultimately* to be borne by residents of the

---

[10] Article XIV provides (1947–2 C.B. 100, 105) :

"A resident of the United Kingdom not engaged in trade or business in the United States shall be exempt from United States tax on gains from the sale or exchange of capital assets."

United Kingdom.[11]  Petitioners therefore maintain that since two of the three *currently indicated* noncharitable remaindermen are United Kingdom residents, two-thirds of the capital gains allocable to such remaindermen are entitled to exemption under the convention.

In apparent support of its proposition, petitioner relies upon *American Trust Co.* v. *Smyth*, 247 F. 2d 149 (C.A. 9, 1957).[12]  That case considered the identical treaty here involved and dealt with a trust, resident in the United States, whose beneficiaries and remaindermen were all United Kingdom residents.  (See the District Court opinion reversed by that decision, 141 F. Supp. 414 (N.D. Cal. 1956).)  The Ninth Circuit, in granting the exemption, concluded (247 F. 2d at 154):

> The Government's contention that the trust is a separate taxable entity under domestic law and hence not a resident of the United Kingdom, is rather finely drawn and entirely overlooks the evident purpose of the Treaty.  The phrase "A resident of the United Kingdom" found in Article XIV, and defined in Article II(1)(g),[5] does not refer to concepts of tax entities under American domestic tax law.  The relevant concept is the economics burden upon the individual taxpayer,[6] and the chief purpose of the Treaty is relief from the economic burden of double taxation. * * * [Footnotes omitted.]

Regrettably, the court failed to identify the character (as to certainty of enjoyment) of the remainders there owned by the British residents.  It can perhaps be inferred from this failure that the court felt the nature of such remainders to be immaterial and that the *American Trust* case thus supports the extension of the convention's benefit wherever the *currently indicated* remaindermen (vested or contingent) are residents of the United Kingdom.  Such a view, however, seems plainly at odds with the Ninth Circuit's "economic burden" approach.  We believe it to be self-evident that the more uncertain the interest of the remaindermen, the less persuasive is the "economic burden" thesis of the *American Trust* case.  Thus, we believe a more logical inference to be that the Ninth Circuit there considered the remainder interests to be indefeasibly vested.  Hence, we do not deem the *American Trust* case to be controlling where the remainders owned by the United Kingdom residents are so indefinite that we cannot say with any assurance whatsoever that a United Kingdom resident will ultimately bear the burden of the United States tax.  Without commenting upon the soundness of the *American Trust* decision, we feel that the uncertainty of the remainder interests here makes that case inapplicable.

Here, it is clear from the provisions of Lambert's will (par. 20) that the trust will terminate upon Ronald's death since Ronald was Ar-

---

[11] Respondent does not challenge petitioners' proposition that under Illinois law the Federal income tax upon capital gains is (absent a provision to the contrary in the trust instrument) chargeable to corpus.  *United States Trust Co. of New York* v. *Jones*, 414 Ill. 265, 111 N.E. 2d 144 (1953).

[12] This decision seems squarely opposed to the recent decision of the Second Circuit in *Maximov* v. *United States*, 299 F. 2d 565 (C.A. 2, 1962).

thur's only child and Arthur was already dead. The indicated remaindermen are the children of Ronald, they being the only issue of Arthur. But which, if any, of Ronald's children (or their heirs) will then take is still a matter of conjecture. Upon Ronald's death, the remaindermen can take only if (a) they are then surviving, or (b) they leave issue who survive Ronald. See Ill. Ann. Stat. ch. 3, sec. 162 (Smith-Hurd 1941); *Mercantile Trust & Savings Bank* v. *Rogers*, 5 Ill. App. 2d 162, 124 N.E. 2d 683 (1955) (defining "per stirpes"). The interest of any child of Ronald thus never matures if he and his issue predecease Ronald.

Petitioner devotes considerable time on brief to arguing that remainders here are "vested subject to open" or "vested subject to defeasance" rather than "contingent." We believe otherwise, and in any event the tax consequences here turn not upon such distinctions but rather upon the nature of such interests, whatever label they bear. See *Helvering* v. *Hallock*, 309 U.S. 106, 118 (1940). Here it is clear that we cannot predict with any certainty that two-thirds of the remaindermen who will take at Ronald's death are, or will be, British residents. Such a prophecy would require us to foresee exactly which of Ronald's children or their issue will survive Ronald and, equally as important, to determine in what proportion such survivors will meet the provisions of article XIV, *supra*. It would compel us to speculate not only as to chances of survival of various parties or their issue but also as to the future residence of such qualifying survivors and as to whether or not they will be engaged in trade or business in the United States. Our inability to exercise such clairvoyance and wisdom is manifest and we will not be so presumptuous as to attempt it. Suffice it to say that we see no basis whatsoever for concluding— even accepting the doctrine of *American Trust Co.* v. *Smyth*, *supra*— that the "economic burden" of any portions of the United States capital gains tax will be ultimately borne by persons meeting the requirements of said article XIV.

We thus decide this issue for respondent.

Other issues have been settled by stipulation.

*Decisions will be entered under Rule 50.*